**SPANISH COUNCIL OF YORK, INC., d/b/a York Spanish American Center, Petitioner**

v.

**PENNSYLVANIA HUMAN RELATIONS COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 5, 2005.

Decided July 20, 2005.

Thomas P. Lang, York, for petitioner.

Joseph T. Bednarik, Harrisburg, for respondent.

BEFORE: SIMPSON, Judge, LEAVITT, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge LEAVITT.

The York Spanish American Center (Center) [1] petitions for review of an adjudication of the Pennsylvania Human Relations Commission (Commission) holding the Center liable under the Pennsylvania Human Relations Act [2] for discriminating and retaliating against two employees. As a consequence, the Center was ordered to make restitution of salary lost by the two individuals who were unlawfully discharged. [3] In this appeal, we consider whether the evidence supported the legal conclusions of the Commission.

The relevant facts, as found by the Commission, are as follows. The Center provides a variety of educational and social services to members of the Spanish–American community in York. Vilma Garcia–Jones was appointed Executive Director of the Center in 1992 and was responsible for the Center's overall operations and finances; she served in that position until her discharge in September 1996. Sterling Feeser served as the Center's Assistant Director, reporting to Garcia–Jones, until his discharge in May 1996. During the tenure of Garcia–Jones and Feeser, the Center's operating budget increased from $150,000 to $350,000 *per annum,* and the Center's mortgage was retired. In February of 1996, the United Way favorably evaluated the Center, concluding that it was a "well-run agency." Commission Exhibit 17.

As Assistant Director, Feeser reviewed the effectiveness of Center programs, supervised staff and assisted in fund-raising by writing grant proposals. In January 1996, Feeser sent a letter to all staff noting certain performance shortcomings and making suggestions for improvement; the letter did so without identifying individual employees. In February 1996, Feeser, who had previously counseled Judy Diaz about her job performance, sent her a warning letter for failing, *inter alia,* to satisfy her monthly hourly quota for case management services, as required under the Center's contract with York County. Diaz's brother-in-law, Anibal Santiago, served on the Center's Board of Directors.

---

1. The "York Spanish American Center" is the fictitious name of the Spanish Council of York, Inc., a non-profit corporation.

2. Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §§ 951–963.

3. Following the filing of her complaint, Vilma Garcia–Jones died. Her claim with the Commission continues as a survival action through her husband, Leroy Jones, who is also executor of Garcia–Jones' estate. 42 Pa. C.S. § 8302.

Soon thereafter, Garcia–Jones received complaints about Feeser from staff members who asserted that Feeser was too strict; Garcia–Jones concluded that these complaints lacked merit.

On March 26, 1996, two members of the Center's Board of Directors, Charles Hoffman and Milagros Lepper,[4] met with Center employees to hear their complaints about Feeser's management style without including either Garcia–Jones or Feeser. This meeting was not consistent with the Center's personnel policy, which established a specific grievance procedure for employee complaints that in no way involved Board members. In addition to disregarding the Center's policy, Hoffman and Lepper never spoke to Feeser about the substance of staff complaints.

On April 2, 1996, Hoffman and Lepper met with Garcia–Jones to discuss the staff's complaints. Hoffman suggested that Feeser be relieved of his supervisory duties and be given ninety days to find new employment. Garcia–Jones responded that she saw no reason to discharge Feeser because his performance was satisfactory. Thereafter, Hoffman began visiting the Center weekly, conferring with staff members about their frustration with Feeser.

The Board held its next monthly meeting on April 16, 1996, which focused on Feeser. The meeting minutes recorded a concern of those present that Feeser was not the best person to act as director of the Center in the event of a vacancy in that position.[5] A Board member moved to direct Garcia–Jones to initiate a search for a new assistant director. While discussing this motion, Garcia–Jones stated that she did not agree with this proposal and opined that Feeser's job performance was satisfactory. Garcia–Jones informed the Board that the meetings between staff and Board members violated the Center's employee handbook. When Garcia–Jones informed the Board that references to Feeser's ethnicity were inappropriate, she was "shouted down." R.R. 667a–669a. The Board meeting then became rather heated, and it concluded without any resolution with respect to Feeser.

Critical to the Commission's findings of discrimination were the number of statements made before, during and after the April 16th Board meeting about Feeser's race; these comments were made both by staff[6] and by Board members. According to Board member Jerri Zimmerman, repeated comments were made that Feeser was not a suitable assistant director because he was not a "Latino."[7] Feeser is a

---

4. Hoffman was President, and Lepper was Vice–President of the Board of Directors.

5. Some Board members apparently assumed Feeser would automatically become executive director should Garcia–Jones leave the position. For example, Lepper asked Garcia–Jones, "[W]hat if you drop dead, Vilma?" Reproduced Record 539a (R.R. ——). There is, however, no provision in the Center's by-laws for the assistant director to assume the executive director's duties in the event of a vacancy. There was testimony that some Board members considered the person acting as assistant director to be the logical choice to be director if something should happen to the

executive director. Others disagreed with this logic.

6. Several people, including Flora Brands, the director of the outpatient and alcohol program, and Feeser himself, overheard staff members using racial epithets in reference to Feeser. The staff members referred to Feeser as a "gringo" or a "pinche gringo," meaning "bloody gringo." R.R. 194a; 196a; 285a–286a.

7. Zimmerman testified about several discussions among Board members about Feeser's ethnicity. Prior to the meeting, Zimmerman overheard Lepper and Abraham Amoros stating the need for a Latino assistant director

white male who is fluent in Spanish and married to a woman of Mexican descent. Several Board members stated that they wanted to eliminate Feeser as a possible replacement for Garcia–Jones because he was white.[8] After the meeting adjourned, Zimmerman suggested to Feeser that he seek legal help because the Board intended to fire him because he was white.

On April 22, 1996, Garcia–Jones sent a letter to the Board criticizing the Board for not following the employee handbook with respect to the handling of personnel problems. The *ad hoc* substitute developed by the Board and staff made no attempt at objectivity. Garcia–Jones advised the Board that it did not have a good

reason to dismiss Feeser and for it to continue in that course would leave the Center open to "legal contention." Commission Exhibit 6. Notably, Feeser could not be properly terminated for poor performance except through the progressive discipline procedures set forth in the Center's employee handbook.[9]

On April 23, 1996, the Board held a special meeting[10] at which it decided to hire a consultant, Dr. Jake Keller, to evaluate the state of affairs between the Board, administration and staff. To that end, Dr. Keller conducted several interviews, but he did not investigate whether staff complaints about Feeser were meritorious or whether Feeser should be disci-

---

and noting that Feeser, although married to a Latino, was not a Latino himself. After the Board meeting, Zimmerman asked Board member Anibal Santiago about his opposition to Feeser serving as assistant director; Zimmerman testified that Santiago responded, "[H]e is not Latino, he is only married to a Latino." R.R. 604a.

Zimmerman also recalled Santiago asserting that "he was tired of the Center serving so many Mexicans, and that [Garcia–Jones] and Mr. Feeser both worked together to serve illegal aliens and it has to be stopped. And he felt that [the Center was] not serving the Puerto Rican community and [was] serving too many other Mexicans and Argentinians and ... other Spanish people." R.R. 605a.

8. Some Board members believed that the Center's Board and administration should be exclusively Latino. Board member Harold Harper, who was not present at the April 1996 meeting, testified as follows:

A. It was my personal goal that eventually, down the road, the board of directors of the Center would all be Latino.
Q. Was it also your personal goal that down the road, the administration of the Center would be all Latino?
A. I assumed that would be the case.
Q. And was it also your personal goal that down the road the staff of the Center would be all Latino?
A. Yes.

R.R. 329a.

9. The Employee Handbook provides, in pertinent part,

*XIX. F a ilure to maintain standards of performance*
The CENTER, as a matter of policy, shall reserve the right to suspend and/or discharge an employee for just cause; however, no one should be discharged on the spot. Before a discharge can become effective, the Executive Director is required to suspend the employee until a complete investigation is made.... The employee disciplined or discharged may file a grievance within ten days of the discipline or the discharged. In the event of a discharge, the grievance shall be heard at the *Second* Step, as outlined below.
* * *
2. Within three days after [a meeting with the Executive Director], the Executive Director shall give a warning letter to the employee, with a copy of that letter placed in the employee's personnel folder[.]
* * *
4. Discharge of an employee shall be on the recommendation of the Executive Director.
Employee Handbook, Section XIX, Center Exhibit 2 (emphasis original).

10. There are no notes or minutes of this meeting.

plined. Dr. Keller prepared a report,[11] which was presented at the Board's May meeting. The report suggested that "[t]his ... also be a good time to determine if Latino Leadership is available in the community, or if it is necessary to develop a Leadership program." Commission Exhibit 7, at 3. The report did not recommend discharging Feeser, and Dr. Keller did not make such a recommendation at the meeting. After hearing this report, the Board voted to eliminate Feeser's position and to create a new grant writer position.[12] To explain the decision to eliminate Feeser's position, Board President Hoffman stated, "I needed to send a message to the staff that [the Board] had heard their complaints and had acted upon them." R.R. 975a. The Board terminated Feeser, effective June 22, 1996.

In September 1996, Feeser filed a complaint with the Commission, alleging racial discrimination by the Center.[13] Eight days after Feeser's complaint was served on the Center, it fired Garcia–Jones. Gar-cia–Jones thereafter filed a complaint with the Commission, asserting that the Center's termination of her employment was unlawful retaliation for her opposition to Feeser's termination.[14]

A Commission hearing panel conducted hearings on the complaints of Feeser and Garcia–Jones between July 2002 and March 2003. The panel found that Feeser had been discharged by reason of his race and that Garcia–Jones had been discharged for supporting Feeser and attempting to counsel the Center's Board against discharging Feeser because it lacked good cause to do so. On July 26, 2004, the Commission accepted the panel's recommendation, adopting *in toto* the panel's findings of fact and conclusions of law. The Commission ordered the Center to cease and desist from discriminating on the basis of race; to cease and desist from retaliating against persons who engage in activity protected by the Act; to pay Feeser a lump sum of $14,993.76 as back pay

11. Dr. Keller's recommendations included: the establishment of a "La Causa Team," consisting of board, administration, and staff members to redefine the Center's mission; the establishment of a new three-year business plan; and a review of procedures and operational strategies. Commission Exhibit 7, at 3.

12. Board member Harper developed the job description for the grant writer position. The grant writer was required to draft grant applications from federal, state and local governments, interact with those entities, and report to the Executive Director. This position was not advertised, and the position was never filled.

13. Feeser based his complaint upon Section 5(a) of the Act, which provides, in relevant part, as follows:

It shall be an unlawful discriminatory practice:

\* \* \*

(a) For any employer because of the race of any individual, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment, if the individual is the best able and most competent to perform the services required.

43 P.S. § 955(a).

14. Garcia–Jones based her complaint, *inter alia,* upon Section 5(d) of the Act, which provides, in relevant part, as follows:

It shall be an unlawful discriminatory practice ...:

\* \* \*

(d) For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act.

43 P.S. § 955(d).

for the years 1996 and 1997; and to pay Leroy Jones, the executor of Garcia–Jones' estate, a lump sum of $70,689 representing her back pay for the years 1996, 1997, 1998, and 1999. The Center now petitions this Court for review of the Commission's adjudication.[15]

On appeal, the Center raises one issue: the Commission erred in finding that the Center had discriminated against Garcia–Jones and Feeser. The Center argues that the weight of the evidence showed that Feeser was terminated for a legitimate non-discriminatory reason, his poor management style, and not for a race-based reason. It follows, the Center argues, that Garcia–Jones' claim should likewise fail because her retaliation claim is premised on Feeser's unproven discrimination claim. The Commission counters that Feeser's performance was a pretextual reason noting, *inter alia*, that Feeser was never disciplined or even counseled about his performance. Racial discrimination is rarely documented and must, instead, be shown by inference from circumstantial evidence, which, the Commission argues, is very strong here. Garcia–Jones was fired eight days after the Center received Feeser's complaint, and this timing supported the inference that Garcia–Jones' support for Feeser caused the Center to retaliate with her discharge.

We consider, first, the Center's argument that the evidence did not show that Feeser was a victim of race-based discrimination. The analytical model es-

tablished by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),[16] provides the burdens of proof that each party bears in an employment discrimination case. Briefly, the complainant bears the burden of establishing a *prima facie* case by showing that: (i) he is in a protected class; (ii) he is qualified for the position; (iii) he suffered an adverse employment action; and (iv) he was discharged under circumstances that gave rise to an inference of discrimination. Once the complainant makes this initial case, the burden then shifts to the employer to articulate some legitimate, non-discriminatory motive for its action. If the employer does so, the complainant is then given the opportunity to demonstrate that the proffered reasons were pretextual. *Id.* at 802, 93 S.Ct. 1817.

The Center contends that Feeser did not satisfy the fourth prong of the *prima facie* case. However, even assuming, *arguendo*, a *prima facie* case, Feeser failed to demonstrate that the Center's stated reason for his discharge, namely, his lack of management skills, was a pretextual reason. In advancing these contentions, the Center does not challenge specific findings of fact as not supported by substantial evidence, and it does not cite a single instance where the *McDonnell Douglas* model was misapplied.

With respect to Feeser's *prima facie* case, the Board found that the circum-

---

**15.** This Court's scope of review of a Commission matter is whether the adjudication is in accordance with law, whether constitutional rights have been violated or whether the findings of fact are supported by substantial evidence. 2 Pa.C.S. § 704; *Robert Wholey Company, Inc. v. Pennsylvania Human Relations Commission*, 146 Pa.Cmwlth. 702, 606 A.2d 982, 983 n. 3 (1992). Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to

support a conclusion. *Borough of Economy v. Pennsylvania Human Relations Commission*, 660 A.2d 143, 146 (Pa.Cmwlth.1995).

**16.** That model was adopted by our Supreme Court in *General Electric Corp. v. Pennsylvania Human Relations Commission*, 469 Pa. 292, 365 A.2d 649 (1976) for purposes of discrimination cases brought under the Act.

stances under which Feeser was discharged gave rise to an inference of discrimination. It based this conclusion on the facts that: (1) the chair of the Board's personnel committee testified that he wanted all employees and board members to be Latino, not white; (2) another Board member advised Feeser that he was going to be fired because he was white; and (3) at the April Board meeting, Garcia–Jones was "shouted down" when she remonstrated that comments about Feeser's race were inappropriate. These facts, which are undisputed, are circumstances that support an inference of discrimination. The Center contends that Feeser never proved that the Center's proffered reason for discharging him, i.e., his lack of management skills, was pretextual. The Commission held otherwise because Garcia–Jones, who was responsible for the supervision and discipline of all employees, found complaints about Feeser's management skills to lack any merit. Further, the Board members' attempt to usurp the executive director's responsibility violated the Center's management policy. Other facts belied the Center's claim that Feeser lacked management skills. The Board never interviewed Feeser or attempted an independent investigation of staff complaints; Feeser was never given an oral or written warning about his performance or in any way disciplined in accordance with the procedures in the employee handbook; and there were no objective indicia of problems at the Center. Under the management of Garcia–Jones and Feeser, the Center's budget and services expanded, and the United Way determined that it was a well-run agency.

On the other hand, staff members who requested the meeting with Hoffman and Lepper were the same staff members who used racial epithets [17] in speaking of Feeser and failed to follow the grievance procedure available to them. The Commission also found it significant that Dr. Keller suggested that the time might be ripe for the Board to involve Latino community leaders in the Center. As a result, the Commission observed that, "[g]iven the fact that several board members could not give any rationale for their decision to eliminate ... Feeser's position, it is not unrealistic that board member[s] would see their action as being 'supportive' of the community." Hearing Panel Opinion at 21.

■ The Center's real complaint is that the Commission did not accept the Center's version of the facts, asserting that it was Feeser's lack of interpersonal skills that led to his discharge. It is the factfinder's province to judge the credibility of witnesses and weigh the evidence, and such matters are solely for the Commission, not this Court. *Albert Einstein Medical Center, Northern Division v. Pennsylvania Human Relations Commission*, 87 Pa.Cmwlth. 145, 486 A.2d 575, 576 (1985). It may be the genuine belief of some Board members that Feeser was not doing his job. However, the Center never investigated this possibility beyond talking to staff members who did not like being told that their performance did not meet expectations. Feeser was never informed that his job performance did not meet expectations, and, by objective standards, the Center was doing well.[18] In any case, the fact that the Center may have mixed mo-

**17.** These racial epithets did not, in themselves, prove discrimination. Ordinarily, the inappropriate remarks of employees cannot be ascribed to the corporation that employs these individuals.

**18.** The Center argues that two employees left in 1996. As noted by the Commission, the record shows that they left to obtain better pay and benefits.

tives for dealing with Feeser did not relieve it of liability because racism was shown to have been one of the Center's motives in discharging him.[19]

In sum, the record supports the conclusion that Feeser was discharged because of his race. The Center's stated reason for Feeser's discharge was his lack of finesse as a manager. Although this stated reason is racially neutral, the Commission concluded that it was a pretextual reason, and the record well supports this conclusion.

■ Next, we consider the Center's arguments with regard to the Commission's conclusion that Garcia–Jones was the victim of retaliation. A *prima facie* case of retaliation requires a complainant to show that: (i) she was engaged in a protected activity; (ii) her employer was aware of the protected activity; (iii) subsequent to participation in the protected activity complainant was subjected to an adverse employment action; and (iv) there is a causal connection between participation in the protected activity and the adverse employment action. *Robert Wholey Company, Inc. v. Pennsylvania Human Rela-*

*tions Commission,* 146 Pa.Cmwlth. 702, 606 A.2d 982, 983 (1992). Upon showing a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. *See McDonnell Douglas, supra.* Finally, the burden shifts to the complainant to show that the respondent's proffered reasons are pretextual. *Id.*

■ The Commission found that Garcia–Jones' protected activity was her opposition to the Board's decision to discharge Feeser without just cause and because he was not Latino; her disagreement with the Board circumventing the Center's grievance procedure by allowing staff members to meet directly with the Board;[20] rebuking Board members who made comments about Feeser's race; and warning the Board that its actions left the Center open to "legal contention."

■ Within eight days of being served with Feeser's employment discrimination complaint, the Board discharged Garcia–Jones. When participation in a protected activity and the occurrence of an adverse employment action occur within close proximity in time, causation is inferred. *Rob-*

---

**19.** In addition to finding direct evidence that the Center's stated reasons for firing Feeser were pretextual, the Commission also used a mixed-motive analysis. A mixed-motive case arises where a complainant demonstrates evidence that a discriminating factor played a motivating part in the respondent's decision in a case. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), the U.S. Supreme Court held that a complainant need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race was a motivating factor for any employment practice. *Id.* at 101, 123 S.Ct. 2148. Using such an analysis, the Commission applied the same facts indicating direct evidence of discrimination to find that race was the motivating fac-

tor in terminating Feeser. Hearing Panel Opinion at 20.

**20.** The Center's Employee Handbook sets forth a three-step grievance procedure for employees to follow should they have questions or problems regarding working conditions, compensation or personal conflicts with supervisors or other employees. The procedure recommends that employees first approach the Executive Director with a verbal complaint. If not satisfied with the results, employees should next file a written grievance with the Executive Director, which will be addressed by the Personnel Committee. Following another possible unsatisfactory result, employees are then encouraged to carry the written grievance to the Executive Committee of the Board. Employee Handbook, Section XXI, Notes of Testimony, July 16, 2002; Center Exhibit 2.

*ert Wholey Co.*, 606 A.2d at 984. Thus, the Commission found, and we agree, that Garcia–Jones established a *prima facie* showing of retaliation.

 The Center claimed that it discharged Garcia–Jones because the Center was having financial difficulties. The Board's creation of the grant writer was intended to alleviate that concern. The Commission rejected these proffered reasons as pretextual.

The Commission found no evidence that the Center was experiencing financial or operational difficulties,[21] but there was copious evidence that Garcia–Jones' support for Feeser led to her discharge. Indeed, the Commission noted that in the Center's answer, it admitted that Garcia–Jones' refusal to demote or discharge Feeser was a factor in its decision to terminate her. At the hearing, several Board members testified otherwise, but the Commission found this testimony not to be credible. Credibility matters are for the Commission, not this Court. *Albert Einstein Medical Center, Northern Division v. Pennsylvania Human Relations Commission*, 87 Pa. Cmwlth. 145, 486 A.2d 575, 576 (1985). The Commission relied upon evidence of record, such as the admission in the Center's answer to Garcia–Jones' complaint, to find that her efforts to advise the Board against Feeser's discharge, led directly to her discharge. The factual findings of the Commission, well supported by substantial evidence, in turn support the Commission's legal conclusion that the Center's proffered reasons for discharging Garcia–Jones were a pretext for unlawful retaliation.

For the above-stated reasons, we affirm the Commission.

---

**21.** Indeed, as noted above, the evidence was directly contrary. The Center increased its operating budget from $150,000 to $350,000; it paid off its mortgage; the United Way found the Center to be "a well-run agency which exists to fill a specific market niche." Hearing Panel Opinion at 7; Finding of Fact No. 18.

### ORDER

AND NOW, this 20th day of July, 2005, the order of the Pennsylvania Human Relations Commission, dated July 26, 2004, in the above captioned matter is hereby affirmed.