## Florimonte v. Scranton Laminated Label Inc.

C.P. of Lackawanna County, no. 08 CV 1569.

*Michael J. Kenny*, for plaintiff.
*Kevin J. Dempsey*, for defendants.

NEALON, *J.*, March 15, 2010—

## I. PROCEDURAL HISTORY

On March 6, 2008, plaintiff Carolyn J. Florimonte instituted this action against her former employer, defendant Scranton Laminated Label Inc., d/b/a Scranton Label and its owner, defendant Edmund J. Carr, asserting gender discrimination, retaliatory discharge and sexual harassment/hostile working environment in violation of title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981a, and the Pennsylvania Human Relations Act, 43 P.S. §951 et seq. (Docket entry no. 1, ¶¶16-34.) A non-jury trial was conducted on February 22, 2010, at which time testimony was received from Carolyn J. Florimonte, Edmund J. Carr, John DeLeo, Amy Ayres, Karen Doyle and Arthur Frounfelker, as well as from John Horoshko (deceased) via deposition dated March 17, 2009. The factual findings set forth below are based upon the credible and relevant testimony and evidence introduced by the parties.

## II. FINDINGS OF FACT

(1) From November 1990 to January 1996, Florimonte was employed by Scranton Label as a customer service representative. In late 1999, she resumed employment with Scranton Label as a sales representative and remained employed in that "at-will" employment capacity until her termination on April 18, 2003.

(2) On April 24, 1995, Scranton Label published a "harassment-free work environment policy statement" which was authored by Carr and distributed to all Scran-

ton Label employees. The policy statement "reaffirm[s] Scranton Label's policy regarding a harassment-free work environment" and confirms that "[a]ll employees have the right to work in an environment free from all forms of discrimination and conduct which can be considered harassing, coercive or disruptive, including sexual harassment." (Joint exhibit no. 1.) The policy statement also notes that "[s]exual harassment is a violation of title VII of the Civil Rights Act of 1964, as amended." (*Id.*) Moreover, the policy statement provides:

"Sexual harassment is a form of misconduct that undermines the integrity of the employment relationship and no employee should be subjected to unsolicited and unwelcome sexual overtures or conduct, either verbal or physical which include any unwelcome sexual advances, request for sexual favors and any other verbal or physical conduct of a sexual nature when submission to such conduct is made either explicitly or implicitly a term or condition of employment; submission to or rejection of such conduct is used as a basis for employment decisions affecting the individual; or when such conduct has the effect of unreasonably interfering with the individual's work performance or creating an offensive working environment. Such behavior may result in disciplinary action up to and including dismissal.

"Examples of acts of sexual harassment which shall not be tolerated include but are limited to:

" • Written—suggestive or obscene letters, poems, notes or invitations;

" • Verbal—derogatory comments, epithets, slurs, or jokes;

" • Physical—impeding or blocking movements; touching, patting, pinching or any other unnecessary physical interferences with normal work;

" • Visual—sexual oriented gestures; display of sexually suggestive or derogatory objects, pictures, cartoons, posters or drawings;

" • Other—threats of insinuations that lack of sexual favors will result in reprisal, punitive actions, change of assignment, or a poor performance evaluations; withholding support for appointment, promotion, transfer.

"Managers and supervisors are responsible for inspecting their respective work areas for materials which might be offensive to others and for certifying that all such materials have been removed. They are also responsible for informing their employees of this policy which prohibits sexual harassment and for ensuring that measures are taken to comply with this policy.

"The following behaviors by managers and supervisors also constitute sexual harassment:

" • Failure to take corrective action when it is known, or reasonably should have been known, that an individual in the line of supervision of the supervisor or manager is being subjected to sexual harassment on the job by anyone; or

" • Retaliation against an employee or applicant who complained of sexual harassment, testified on behalf of someone who made a complaint, or who assisted or participated in any manner on behalf of a complainant in an investigation, proceeding, or hearing will not be adversely affected in terms and conditions of employ-

ment, nor discriminated against or discharged because of the complaint under this policy.

"Persons who believe they have been or are being sexually harassed, are aware of or suspect the occurrence of sexual harassment, or desire counseling on coping with harassment should contact me. Sexual harassment issues will be quickly and confidentially investigated to determine the facts and to recommend the appropriate remedy. All investigations will be designed to protect the privacy and rights of all parties concerned.

"Sexual harassment will not be tolerated. Prompt action will be taken to treat sexual harassment as other potential disciplinary actions are handled. Through consistent, determined application of this policy, we will preserve the right of all persons to an environment free of sexual harassment and sexual intimidation." (*Id.*)

(3) While Florimonte was employed as a sales representative with Scranton Label, several employees of Scranton Label, including Florimonte, occasionally used profanity in the office, but never cursed in the presence of customers nor did they use profane language that was of a sexual nature.

(4) In addition to Florimonte, Scranton Label employed John Horoshko and Thomas Guzy as sales representatives. Because of the type of manufacturing equipment utilized by Scranton Label, the success of Scranton Label's operations was dependent upon large industrial accounts rather than smaller boutique business, and sales representatives were encouraged to solicit and secure large industrial accounts. Since Florimonte devoted most of her sales efforts to smaller boutique accounts, she generated $130,031.87 in sales between April

1, 2002 and March 31, 2003. In contrast, Mr. Horoshko's annual sales ranged between $1,500,000 and $2,000,000 and Mr. Guzy's annual sales exceeded $900,000.

(5) For Scranton Label to yield an adequate profit margin from its operations, Scranton Label's sales representatives must each generate at least $500,000 in annual sales.

(6) During the first quarter of 2003, Florimonte developed unfounded suspicions that representatives of Scranton Label had installed surveillance or recording devices in her company vehicle and at her office desk with the assistance of the Federal Bureau of Investigation (FBI).

(7) In the late afternoon of April 10, 2003, Florimonte placed a letter on Carr's desk which he first discovered and read at approximately 3 p.m. on April 11, 2003. In her letter, Florimonte accused Carr and Scranton Label of installing surveillance and listening devices in her company issued Ford Taurus and at her workstation. Specifically, Florimonte advised Carr that she "would like [him] to remove the listening devices from my car, the car that you said was mine when you hired me to work at Scranton Label." (Joint exhibit no. 2, p. 1.) Florimonte also referenced recent office renovations that had been completed, and remarked:

"I believe the renovations were accomplished in order to install listening devices and possibly visual devices in the office where my desk is located. I have no objection to this. What I object to is that everyone knew about it but me. When Kevin [Carr] took my car for repairs last month, it was a short leap for me to think that listen-

ing devices were also installed in the car. I've seen them so I know I was right.

"The stress of knowing all of this has had an effect on my health and is affecting my work in that I find myself feeling annoyed with customers. It has also made me very angry and bitter and I can curse like a dockworker when I'm in the car, because of that anger and bitterness. I do not, however, bring that behaviour (sic) into the office and inflict it on others. People can think what they want of me but your invasion of my privacy is very disturbing to me." (*Id.,* p. 2.)

(8) Florimonte further stated in her letter to Carr that "since you are so anxious to know my every movement and innermost thoughts, I thought I would share them with you." (*Id.,* p. 1.) Florimonte proceeded to criticize seven co-employees, including Carr's son. For example, Florimonte alleged that:

"(a) Kevin Carr was romantically interested in a co-worker, Cathy Fayocavitz, and 'bragged about how when you die, he would have tons of money, a boat, a big house and Cathy would have everything she ever wanted.'

"(b) Cathy Fayocavitz 'encouraged Kevin [Carr] to hang around in the office,' 'stole all of the snack money,' became 'annoyed' when Florimonte questioned her about it, and stated that she 'would put it back.'

"(c) John DeLeo was 'dedicated and hard working' and Florimonte was 'very fond of him.' However, Florimonte was 'very disappointed in him' since '[h]e has two daughters and I wonder how he would feel if someone were doing to them what you all have been doing to me.';

"(d) John Horoshko 'has never gotten over the fact that I don't think that he is God's gift to women,' and 'uses sexual innuendo with customers and curses in the office.';

"(e) Tom Guzy caused Florimonte to lose the Arlington Industries account and made her look foolish in front of that customer.;

"(f) Arthur Frounfelker 'is very intelligent and trained me well,' but '[s]peed is not part of his work ethic' and 'he really doesn't want to be at work.';

"(g) With regard to Jess Kostiak, 'you already know my opinion' of her. (*Id.*, pp. 1-2.)

(9) Florimonte acknowledged in her letter 'that I worked some personal errands into my work day,' but asserted that '[i]f this is objectionable to you, tell me what my work hours are to be and I will confine my Label work only to those hours.' (*Id.*, p. 2.) Florimonte concluded her correspondence to Carr by stating:

"If you want to fire me, do it. If I stay, I'd appreciate more vacation time and a serious increase in salary and your assurance that this nonsense is over. I've brought a lot of expertise and ability to your business and professionalism that I find lacking in my associates. The question in my mind is do I really want to work where my ethics are questioned?" (*Id.*)

(10) Florimonte's letter of April 10, 2003 did not reference Scranton Label's harassment-free work environment policy statement, nor did it mention the term "harassment" or claim any violation of that policy statement other than the alleged use of surveillance and recording devices.

(11) Upon receiving Florimonte's foregoing letter, Carr reviewed it with the employees who were referenced in the letter, with the exception of Cathy Fayocavitz who was no longer an employee of Scranton Label. Carr and those individuals deemed Florimonte's allegations to be "bizarre," "absurd," "ridiculous" and "ludicrous."

(12) Within one hour of receiving Florimonte's letter, Carr hired a private investigator, retired State Trooper Walter P. Carlson, to examine Florimonte's Ford Taurus vehicle in order to determine whether any surveillance or recording devices had been installed in the vehicle. During his law enforcement career, Mr. Carlson had been certified as a wiretap specialist by the Pennsylvania State Police and the Office of the Attorney General of the Commonwealth of Pennsylvania.

(13) Once Carr retained Mr. Carlson, he immediately contacted Florimonte at her residence and advised her to lock the Ford Taurus until Mr. Carlson arrived so that no individual could have access to the vehicle prior to Mr. Carlson's inspection.

(14) Mr. Carlson arrived at Florimonte's residence at 6:30 p.m. on April 11, 2003. Florimonte advised Mr. Carlson "that the [recording] devices were attached to the underside or bottom of the front seats of the vehicle." (Defendants' exhibit no. 3, p. 1.) After examining that portion of the vehicle, Mr. Carlson informed Florimonte that the items that she "was referring to were plastic clips for attachment to the vehicle wiring that came from beneath the carpeting of the vehicle" and "were not listening devices." Mr. Carlson examined the remainder of the vehicle and was unable to discover any evidence of any type of a recording device. (*Id.,* pp. 1-2.)

(15) While at the Florimonte residence, Mr. Carlson observed another Ford Taurus vehicle which Florimonte indicated was a rental vehicle. With her permission, Mr. Carlson examined "the underside or bottom of the front seats of the rental" vehicle and determined that "the wiring and harnesses were the same as on the 1998 model" that Scranton Label had provided to Florimonte. Mr. Carlson advised Florimonte of those identical features "to ease her mind that the devices that she saw were in fact just factory items for the wiring of the car." (*Id.*, p. 2.)

(16) After Mr. Carlson completed his vehicle examination, he asked Florimonte "if she wanted to make arrangements with Mr. Carr to go to her office and have it examined for recording devices." In response, Florimonte "stated that she was no longer interested in that and did not care about her office." Prior to Mr. Carlson's departure from Florimonte's residence, "Florimonte was again asked if she wanted the office checked at work and she stated she did not and thanked [Carlson] for checking the vehicle." (*Id.*)

(17) With Carr's consent, Florimonte independently retained another inspection service from New Jersey to examine the Ford Taurus vehicle for recording devices. The New Jersey inspection company likewise was unable to discover any surveillance or recording devices in the vehicle.

(18) Two former employees of Scranton Label, Amy Ayres and Karen Doyle, testified that Florimonte was very difficult to work with and repeatedly complained about nonexistent problems.

(19) Prior to Carr's receipt of Florimonte's letter on April 11, 2003, Carr had considered terminating Florimonte due to her poor sales performance and frequent disagreements with other employees, but had not done so.

(20) After deliberating for one week following his receipt of Florimonte's letter, Carr forwarded a letter to Florimonte on April 18, 2003 notifying her that her "employment at Scranton Label Inc. has been terminated as of Friday, April 18, 2003." Carr informed Florimonte that her termination was "due to the bizarre behavior you have exhibited over the past week toward my employees and me" and he expressed "hope [that] you seek the medical attention that you desperately need." (Joint exhibit no. 3.)

(21) Florimonte filed an application for unemployment compensation benefits and a hearing was conducted before referee Walter Alexandroff on June 10, 2003, at which time Florimonte was represented by counsel. By written decision dated June 17, 2003, referee Alexandroff concluded that (a) Florimonte's surveillance/recording devices allegations were unfounded and (b) Florimonte was ineligible for unemployment compensation benefits based upon her "willful misconduct" at work in persisting with her unsubstantiated accusations. (See referee Walter Alexandroff's decision dated 6/17/03 attached to defendants' answer and new matter as exhibit B.)

(22) Florimonte appealed referee Walter Alexandroff's decision to the Unemployment Compensation Board of Review, and on August 20, 2003, the Unemployment Compensation Board of Review issued an order affirm-

ing referee Alexandroff's decision and denial of unemployment compensation benefits. (*Id.*, exhibit C.)

(23) Florimonte appealed the Unemployment Compensation Board of Review's determination to the Commonwealth Court of Pennsylvania. On March 16, 2004, the Commonwealth Court affirmed the Unemployment Compensation Board of Review order and held:

"Here, the board ultimately found that [Florimonte] was terminated because she persisted in making false allegations against her employer. On April 10, 2003, [Florimonte] sent employer a letter accusing employer and her co-workers of conspiring to spy on her by installing surveillance equipment in her car and office. Edmund Carr, the owner, testified that upon receiving the letter, he immediately hired an investigator to examine her vehicle. The investigator examined [Florimonte's] car on April 11, 2003 and found no evidence to support [Florimonte's] allegations. [Florimonte] was dissatisfied with the investigation and hired her own investigator, who also found no evidence of listening devices in the car. With regard to the claims of surveillance in her office, Carr testified that there were no cameras or listening devices in her office. Carr offered to allow [Florimonte] to come in to the office and point out where she believed surveillance devices were concealed, but [Florimonte] declined.

"Despite the results of the investigation, [Florimonte] never retracted her allegations and continued to make unfounded accusations that employer was monitoring her actions through surveillance. [footnote omitted] Although [Florimonte] attempted to justify her conduct, [Florimonte] offered no evidence to support her allega-

tions other than her subjective belief that her co-workers were eavesdropping on her. (N.T. at 31.) . . . Based upon our review of the record, the board's findings are supported by substantial evidence and support the conclusion that [Florimonte] had acted in disregard of a standard of behavior which her employer could rightfully expect." (*Id.,* exhibit D, pp. 6-7, attaching *Florimonte v. Unemployment Compensation Board of Review,* no. 2173 C.D. 2003 at pp. 6-7 (Pa. Commw. Mar. 16, 2004.)

(24) Florimonte's immediate replacement, Marianne Marchellitis, originally generated $280,076.19 in annual sales while her successor, Jennifer Gallagher, produced $924,907.43 in annual sales for Scranton Label.

(25) During its more than 40 years in business, Scranton Label has never installed any surveillance equipment or listening devices at its place of employment or in its company vehicles.

(26) Florimonte continues to believe that representatives of Scranton Label and the FBI installed surveillance/recording devices in her company car and at her work area in Scranton Label's offices.

(27) During the bench trial on February 22, 2010, Florimonte provided the following sworn testimony in response to questioning by the undersigned:

"Q. Let me make sure I understand your testimony. What you maintain was the harassment in violation of the company policy was the surveillance that was being conducted. That's what you maintain was the harassment?

"A. Yes.

"Q. And you also maintain that that surveillance was the cause of the anxiety and the stress and the reflux and health issues?

"A. Yes. And I believe that all the people that I had mentioned in that April 10 letter were involved in the surveillance. They knew about.

"Q. So when you identified all these individuals in the letter, you were identifying them because you thought that in some form or another they were involved with the surveillance that you believe was being conducted?

"A. Yes.

"Q. So when you have asserted a violation of the harassment-free policy from 1995, the basis for that is the surveillance that was being conducted, that you thought was?

"A. Yes.

"Q. Thank you. That's all I have." (T.P. on 2/22/10, pp. 276-77.)

(28) After Florimonte's counsel interjected that Florimonte's harassment claim involved "not just the surveillance," but also "the cursing in the office and the sexual innuendo," (*id.* at p. 277), the following additional questioning and sworn testimony transpired:

"Q. I'm sorry, ma'am. I thought you just told me when I asked you in referencing your April 10, 2003 letter and what you are maintaining was a violation of the harassment-free work environment policy, that what you are maintaining was the harassment was the surveillance?

"A. Yes.

"Q. Okay. And that the reason you identified all these individuals; Kevin [Carr], Cathy [Fayocavitz], Jack [DeLeo], John [Horoshko], Tom [Guzy], Art [Frounfelker] and Jess [Kostiak] was because you thought that in some form or another they were involved with that surveillance?

"A. Yes.

"Q. Okay, And so—

"A. Or knew about it.

"Q. Or knew about it. And when you were referencing the anxiety and the stress, and you testified about reflux and some other health issues, they were all related to the surveillance?

"A. Yes, because I really—I loved my job. Office politics was the problem.

"Q. But when you say office politics—

"A. And the surveillance.

"Q. You're talking about the surveillance?

"A. Right.

"Q. Okay. That's what I'm trying to make sure. The surveillance is what you maintain was a violation of the harassment-free policy and nothing else?

"A. Just the things that I mentioned in the letter, you know. But mainly the surveillance.

"Q. *Well, when you say mainly, what else would have been part of the violation of the harassment free work environment?*

"A. *I objected to the fact that everybody knew about it but me.*

"Q. About the surveillance?

"A. (Witness nodding.)

"Q. You have to say yes or no.

"A. Yes.

"Q. I know you're nodding your head but the court reporter—

"A. Yes.

"Q. *And that would be it?*

"A. *Yes.*

"Q. Okay. Thanks. (*Id.* pp. 278-80.) (emphasis added)

### III. DISCUSSION

In advance of the bench trial during which Florimonte provided the above-quoted testimony, Florimonte submitted proposed findings of fact and conclusions of law which advance three causes of action. First, Florimonte contends that Scranton Label and Carr discriminated against her on the basis of her sex when they discharged her on April 18, 2003 (Plaintiff's proposed findings of fact/conclusions of law, ¶¶40-43.) Second, Florimonte alleges that Scranton Label and Carr are liable for a sexually hostile work environment in violation of federal and state law and their harassment-free work environment policy statement. (*Id.,* ¶¶48-49, 53-56.) Third, Florimonte maintains that she is entitled to recover for retaliatory discharge inasmuch as Scranton Label and Carr terminated her after she engaged in protected activity by complaining about their sexually hos-

tile work environment. (*Id.*, ¶¶44-47, 50-52.) Florimonte's arguments will be addressed ad seriatim.

### (A) *Gender Discrimination*

Under title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against an individual with regard to, inter alia, hiring, compensation, or terms or conditions of employment because of that individual's sex. See 42 U.S.C. §2000e-2(a). The PHRA similarly prohibits an employer from discriminating against an employee based upon gender. See 43 P.S. §955(a). In employment discrimination cases brought pursuant to title VII and the PHRA, Pennsylvania courts utilize the analytical model that was formulated by the Supreme Court of the United States in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and adopted by the Pennsylvania Supreme Court in *General Electric Corp. v. Pennsylvania Human Relations Commission,* 469 Pa. 292, 365 A.2d 649 (1976). See *Goosby v. Johnson & Johnson Medical Inc.,* 228 F.3d 313, 318-19 (3d Cir. 2000); *Spanish Council of York Inc. v. Pennsylvania Human Relations Commission,* 879 A.2d 391, 397 and n.16 (Pa. Commw. 2005).

Where, as here, the employee does not offer any direct evidence of discriminatory treatment, federal and state law provides a burden-shifting framework for an employee to prove indirect evidence of discrimination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993); *Kroptavich v. Pennsylvania Power & Light Company,* 795 A.2d 1048, 1055 (Pa. Super. 2002). Under this approach, the employee bears the initial burden of demonstrating a prima facie case of discrimination by a pre-

ponderance of the evidence. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981); *Kroptavich, supra.* A prima facie case is established by showing that: (1) the employee is a member of a protected class; (2) [s]he was discharged from a job for which [s]he was qualified; and (3) other employees not in the protected class were treated more favorably. See *McDonnell Douglas,* 411 U.S. at 802-803; *Hugh v. Butler Co. Family YMCA,* 418 F.3d 265, 267 (3d Cir. 2005), *cert. denied,* 546 U.S. 1094 (2006); *Campanaro v. Pennsylvania Electric Company,* 738 A.2d 472, 476 (Pa. Super. 1999), *appeal denied,* 561 Pa. 684, 751 A.2d 183 (2000); *Kryeski v. Schott Glass Technologies Inc.,* 426 Pa. Super. 105, 110-11, 626 A.2d 595, 597-98 (1993), *appeal denied,* 536 Pa. 643, 639 A.2d 29 (1994). If the employee fails to satisfy this initial burden, the employer is entitled to judgment as a matter of law. *Pivirotto v. Innovative Systems Inc.,* 191 F.3d 344, 352 n.4 (3d Cir. 1999); *Kroptavich, supra.*

However, if the employee demonstrates a prima facie case of discrimination by a preponderance of the evidence, a presumption of discrimination arises and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment decision. *Reeves v. Sanderson Plumbing Products Inc.,* 530 U.S. 133, 142 (2000); *Campanaro, supra; Bailey v. Storlazzi,* 729 A.2d 1206, 1212 (Pa. Super. 1999). The employer's burden in this regard "is one of production, not persuasion" and, therefore, involves no credibility assessment. *St. Mary's Honor Center,* 509 U.S. at 509; *Kroptavich, supra.* If the employer articulates a legitimate business explanation for the employment action, "then the presumption of dis-

criminatory intent created by the employee's prima facie case is rebutted and the presumption simply 'drops out of the picture.'" *St. Mary's Honor Center, supra* at 511; *Seman v. Coplay Cement Company,* 26 F.3d 428, 432 (3d Cir. 1994); *Kroptavich, supra.* In that event, the *McDonnell Douglas* standard affords the employee an opportunity to prove that the reasons proffered by the employer "were not its true reasons, but were a pretext for discrimination." *Reeves,* 530 U.S. at 143; *Burdine,* 450 U.S. at 253; *Campanaro,* 738 A.2d at 476.

Florimonte failed to establish a prima facie case of discrimination by demonstrating that male employees were treated differently or more favorably than Florimonte. As indicated above, Florimonte's trial evidence focused upon her unsubstantiated, subjective belief that surveillance and recording devices had been installed in her company vehicle and at her work desk, and did not establish that male employees of Scranton Label received preferential treatment. Furthermore, the credible evidence reflected that Florimonte was terminated due to her relentless and illusory accusations regarding eavesdropping and the detrimental effect that those allegations were having on Scranton Label's workforce. In fact, after a full hearing on the merits, Florimonte was declared ineligible for unemployment compensation benefits and adjudged chargeable with "willful misconduct" for persisting with those unjustified accusations. Florimonte has not demonstrated that the articulated business reasons for her termination were pretextual or that any form of sex discrimination directly or indirectly factored into the decision to discharge her. Therefore, Florimonte has failed to establish a pretext claim of sex discrimination under federal or state law.

In addition to a pretext claim of gender discrimination, an employee may alternatively prove sex discrimination under a mixed-motive theory of liability as set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989). To establish a mixed-motive claim, an employee may show that an adverse employment decision "was made based on both legitimate and illegitimate reasons." *Makky v. Chertoff,* 541 F.3d 205, 213 (3d Cir. 2008). Florimonte may succeed with a mixed-motive claim by establishing that in addition to other non-discriminatory reasons, her gender was a motivating factor for her discharge. See *Desert Palace Inc. v. Costa,* 539 U.S. 90, 101 (2003); *Spanish Council of York,* 879 A.2d at 399 n.19. For the reasons set forth above, Florimonte has not remotely demonstrated that her gender was a motivating factor for her termination. Her discharge was based upon her unwarranted allegations concerning surveillance and the negative impact that those persistent accusations were having on Scranton Label's employees and operations. Accordingly, Florimonte has not established her right to relief under either the pretext theory articulated in *McDonnell Douglas* or the mixed-motive theory set forth in *Price Waterhouse*.

(B) *Sexual Harassment/Hostile Work Environment*

Florimonte further contends that Carr and Scranton Label subjected her to a sexually hostile work environment in violation of title VII of the Civil Rights Act and the PHRA. Sexual harassment is actionable under title VII if it is "so 'severe or pervasive' as to 'alter the conditions of [the employee's] employment and create an abusive working environment.'" *Faragher v. Boca Raton,* 524 U.S. 775, 786 (1998); *Meritor Savings Bank*

*F.S.B. v. Vinson,* 477 U.S. 57, 67 (1986). The United States Supreme Court has "explained that in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher,* 524 U.S. at 787 (citing *Harris v. Forklift Systems Inc,* 510 U.S. 17, 21-22 (1993)).

However, the "mere utterance of an epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment to implicate title VII." *Harris,* 510 U.S. at 21 (quoting *Meritor Savings Bank,* 477 U.S. at 67). As the Supreme Court has observed, title VII is not a "general civility code," nor is it meant to "purge the work place of vulgarity." *Oncale v. Sundowner Offshore Services Inc.,* 523 U.S. 75, 81 (1998). Rather, "[t]hese standards for judging hostility are sufficiently demanding to ensure that . . . they will filter out complaints attacking the ordinary tribulations of the work place, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher,* 524 U.S. at 788. The factors to be considered in determining whether a work environment is objectively and subjectively hostile or abusive "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23.

To establish a sexually hostile work environment under the PHRA, 43 P.S. §955(a), an employee must demonstrate that: (1) [s]he suffered intentional discrimination because of her gender; (2) the harassment was severe or

pervasive and regular; (3) the harassment detrimentally affected the employee; (4) the harassment would detrimentally affect a reasonable person of the same protected class; and (5) the harasser was a supervisory employee or agent. *Raya and Haig Hair Salon v. Pennsylvania Human Relations Commission,* 915 A.2d 728, 733 (Pa. Commw. 2007); *Infinity Broadcasting Corp. v. Pennsylvania Human Relations Commission,* 893 A.2d 151, 158 (Pa. Commw. 2006), *appeal denied,* 588 Pa. 785, 906 A.2d 545 (2006). In determining whether a work environment is sufficiently hostile or abusive to establish a viable claim under the PHRA, Pennsylvania courts apply the same federal analysis and criteria outlined in *Faragher; Harris* and *Meritor Savings Bank.* See *Infinity Broadcasting Corp.,* 893 A.2d at 158-59.

Florimonte has failed to develop the elements of a sexually hostile work environment claim under federal or state law. During her trial testimony, Florimonte identified two purported violations of Scranton Label's sexual harassment-free work environment policy statement: (1) the alleged installation of surveillance and recording devices with the assistance of the FBI; and (2) her fellow employees' alleged knowledge of that surveillance. (T.P. on 2/22/10, pp. 276-80.) As discussed above, those suspicions were wholly unfounded and were determined to constitute "willful misconduct" in Florimonte's unemployment compensation proceeding. More importantly, those allegations did not involve a sexually objectionable environment giving rise to a cause of action under title VII or the PHRA. Consequently, Florimonte's sexually hostile work environment claim is not supported by her own trial testimony.

Even if Florimonte's above-quoted testimony were to be disregarded and the remaining evidentiary record examined in a light most favorable to her, Florimonte's sexual harassment/hostile work environment claim would nonetheless fail. In her letter to Carr dated April 10, 2003, Florimonte made reference to alleged flirtation between Kevin Carr and Cathy Fayocavitz, John Horoshko's cursing in the office, and his use of "sexual innuendo" with customers.[1] When asked to identify that sexual innuendo, Florimonte testified that she recalled overhearing Mr. Horoshko ask a male customer whether he had "made love with his wife" recently. Florimonte did not claim in her testimony that any cursing in the office or Mr. Horoshko's single instance of sexual dialogue with a male customer somehow contributed to Florimonte's poor sales or unreasonably interfered with her work performance.

The foregoing incidents were not sufficiently severe or pervasive so as to create a sexually hostile work environment under federal and state decisional precedent. Florimonte did not establish that the occasional use of profanity in the office or Mr. Horoshko's sole use of sexual innuendo in her presence was directed at Florimonte.[2] Compare *Harris,* 510 U.S at 19 (employer's

---

1. Florimonte also stated in her letter that John DeLeo "has two daughters and I wonder how he would feel if someone were doing to them what you all have been doing to me." However, during her trial testimony, Florimonte confirmed that the reference to Mr. DeLeo's daughters related solely to the alleged surveillance and her belief that she was "being laughed at" by her co-workers as a result of that surveillance.

2. John DeLeo testified that Florimonte participated in a conversation with him concerning oral sex during which she described a sexu-

president stated to the employee in the presence of her co-workers "that the two of them go to the Holiday Inn to negotiate Harris' raise," "asked Harris and other female employees to get coins from his front pants pocket," "threw objects on the ground in front of Harris and other women, and asked them to pick the objects up," and "made sexual innuendos about Harris' and other women's clothing."); *Raya & Haig Hair Salon,* 915 A.2d at 731 (supervisor verbally and physically sexually harassed "complainant by telling sexual jokes, making comment about complainant's breasts, telling complainant that she would be good in bed, telling complainant that he would personally perform an abortion if she became pregnant, calling complainant a 'bitch', touching complainant's rear end, placing his arms around complainant, placing his hands in complainant's pockets, rubbing up against complainant, and repeatedly poking complainant in the shoulder."). For example, in *Moyer v. Kaplan Higher Education Corp.,* 413 F. Supp.2d 522 (E.D. Pa. 2006), the federal district court granted the employer's summary judgment motion and reasoned:

"Plaintiff testified at her deposition that [plaintiff's supervisor] Rothberg did not direct any of her cursing at plaintiff because she was a woman and that in fact Rothberg cursed in front of both male and female employees. (citation omitted) While Rothberg's cursing may have been crude and unprofessional, we find as a matter of law that such cursing, especially when not directed specifically at plaintiff, does not violate title VII and that no

al practice known as "snowballing" with which he was unfamiliar. (T.P. 2/22/10, pp. 200-201.)

reasonable person in plaintiff's position would have believed that it did. As noted by the Supreme Court, title VII is not a 'civility code' and is not meant to 'purge the work place of vulgarity.' (citation omitted)

"We also find as a matter of law that the 'blow job' and 'slut' comments were two isolated incidents over a 15-month period that simply do not constitute the type of pervasive and regular harassment forbidden by title VII and that no reasonable person in plaintiff's position would have believed these isolated remarks constituted a hostile work environment." *Id.* at 527.

Similarly, the court in *Nolan v. Swartz Campbell LLC,* 2008 WL 598291 (W.D. Pa. 2008) dismissed an employee's hostile work environment claim and concluded:

"Plaintiff has advanced evidence that [her supervisor] Winikoff distributed between five and eight emails that contained derogatory jokes and off-colored demeaning or negative sexual depictions or comments based on gendered stereotypes of men and women. . . .

"While the emails as identified and described by plaintiff were no doubt crude and could be viewed as vulgar, there is nothing in their content to suggest they were forwarded to plaintiff with an intent to demean, humiliate, ridicule or intimidate her in particular because of her sex or gender. There were no sexual propositions, innuendo pornographic materials or sexually derogatory language directed at plaintiff." *Id.* at *8. Accord *Tiffany v. KDF Company LLC,* 2005 WL 2739137 (N.D.N.Y. 2005) ("A comment about the paternity of plaintiff's unborn child, disclosure of a sexual dream involving

plaintiff, comments about the sexual actions between co-workers, and a comment about a gift of lingerie do not create the severe type of work environment against which the hostile work environment claim was created to protect.").

Based upon the foregoing evidence and case law, the alleged flirtation between fellow employees, the profanity that was not of a sexual nature nor addressed to Florimonte, and the isolated sexual reference between Mr. Horoshko and a male customer are collectively insufficient to create a sexually objectionable environment that is objectively and subjectively offensive. The instances in question were not so severe or pervasive as to alter Florimonte's employment conditions and result in an abusive working environment. Therefore, a verdict will be entered in favor of Carr and Scranton Label with respect to Florimonte's sexually hostile work environment claim.

## (C) *Retaliatory Discharge*

Last, Florimonte asserts that she was wrongfully terminated in retaliation for protected activity in violation of title VII, 42 U.S. §2000e-3(2), and the PHRA, 43 P.S. §955(d). Federal and state retaliatory discharge claims employ a burden-shifting analysis that is similar to the framework applicable to pretext claims of discrimination. Absent sufficient direct evidence of retaliatory animus, an employee alleging retaliatory discharge liability under 42 U.S.C. §2000e-3(a) must demonstrate a prima facie case of retaliation by showing that: (1) the employee engaged in protected activity; (2) the employee was

discharged subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the discharge.[3] *Woodson v. Scott Paper Company,* 109 F.3d 913, 920 (3d Cir. 1997), *cert. denied,* 522 U.S. 914 (1997); *Quiroga v. Hasbro Inc.,* 934 F.2d 497, 501 (3d Cir. 1991). To prevail with a retaliatory discharge claim under 43 P.S. §955(d), the employee must establish a prima facie case by proving that: (1) the employee engaged in protected activity; (2) the employer was aware of the protected activity; (3) subsequent to the employee's participation in the protected activity, the employee was subject to an adverse action by the employer; and (4) there is a causal connection between the employee's participation in the protected activity and the employer's adverse employment action. *Circle Bolt & Nut Company Inc. v. Pennsylvania Human Relations Commission,* 954 A.2d 1265, 1268-1269 (Pa. Commw. 2008), *appeal denied,* 600 Pa. 765, 967 A.2d 961 (2009).

If the employee succeeds in establishing a prima facie case of retaliation, the burden of production shifts to the

---

3. If the employee produces the requisite direct evidence of retaliatory animus at trial, [s]he may proceed forward based upon a mixed-motives theory of liability. See *Walden v. Georgia-Pacific Corp.,* 126 F.3d 506, 512 (3d Cir. 1997) ("In a mixed-motives case, the evidence put forth by the plaintiff is so revealing of retaliatory animus that it is unnecessary to rely on the *McDonnell Douglas/Burdine* burden-shifting framework, under which the burden of proof remains with the plaintiff."), *cert. denied,* 523 U.S. 1074 (1998). With a mixed-motives claim of retaliatory discharge, the burden of production and risk of non-persuasion shift to the defendant, which must show that, even if retaliation was a motivating factor in the adverse employment decision, it would have made the employment decision in the absence of retaliatory animus." *Id.* at 512-13; *Armbruster v. Unisys Corp.,* 32 F.3d 768, 778 (3d Cir. 1994).

employer to articulate some legitimate, nondiscriminatory reason for its employment action. *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994); *Uber v. Slippery Rock University of Pennsylvania,* 887 A.2d 362, 367 (Pa. Commw. 2005). "The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the discharge; the defendant need not prove that the articulated reason actually motivated the discharge." *Woodson,* 109 F.3d at 920 n.2. If the employer does articulate some legitimate non-discriminatory motive for its action, the employee asserting a federal claim "must convince the fact finder 'both that the reason was false, and that discrimination was the real reason.'" *Id.* (quoting *Hicks,* 509 U.S. at 512). With a state law retaliation claim, the burden shifts back to the employee to show that the employer's stated reasons were pretextual. *Circle Bolt & Nut Company,* 954 A.2d at 1269; *Uber, supra; Spanish Council of York,* 879 A.2d at 399.

In the context of the employee's proof of a prima facie case of retaliation, "protected activity" includes informal protests of discrimination or harassment such as complaints to management. See *Circle Bolt & Nut Company,* 954 A.2d at 1269 n.12; *Bailey v. Storlazzi,* 729 A.2d 1206, 1214 n.9 (Pa. Super. 1999). For the reasons discussed in section III(A) and (B) above, Florimonte did not engage in protected activity when she repeatedly made unsupported claims that the FBI and Scranton Label/Carr had installed surveillance and recording devices in her vehicle and at her workstation. Her persistence with those ethereal allegations, which were deemed to constitute "willful misconduct" in a separate adjudication, was the non-discriminatory reason that actually motivated the decision to terminate her. Thus, Flori-

monte has failed to establish this she was terminated in violation of 42 U.S.C. §2000e-3(a) or 43 P.S. §955(d).[4]

## NON-JURY VERDICT

And now, March 15, 2010, upon consideration of the credible evidence and arguments presented during the non-jury trial on February 22, 2010, and based upon the factual findings and legal conclusions set forth in the foregoing non-jury verdict pursuant to Pa. R.C.P. 1038, it is hereby ordered and decreed that a verdict is entered in favor of the defendants, Scranton Laminated Label Inc. d/b/a Scranton Label and Edmund J. Carr, and against the plaintiff, Carolyn J. Florimonte, with regard to all claims brought pursuant to title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981a, and the Pennsylvania Human Relations Act, 43 P.S. §951 et seq .

---

4. Even if Florimonte's retaliation claim was somehow addressed as a mixed-motives case notwithstanding the lack of any direct evidence of retaliatory animus, Florimonte still would not succeed with her claim since the credible evidence established that Carr and Scranton Label would have made the same employment decision (for the reasons stated in their termination letter) in the absence of any alleged retaliatory animus. See *Walden,* 126 F.3d at 512-13.