CIRCLE BOLT & NUT COMPANY,
INC., Petitioner

v.

PENNSYLVANIA HUMAN
RELATIONS COMMISSION,
Respondent.

Commonwealth Court of Pennsylvania.

Submitted July 3, 2008.
Decided Aug. 11, 2008.

Alexia Kita Blake, Scranton, for petitioner.

Joseph T. Bednarik, Asst. Chief Counsel and Michael Hardiman, Chief Counsel, Harrisburg, for respondent.

BEFORE: McGINLEY, Judge, FRIEDMAN, Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

Circle Bolt & Nut Company, Inc. (Circle) petitions for review from a determination of the Pennsylvania Human Relations Commission (Commission), which concluded that Circle unlawfully retaliated against Tracy Dixon (Dixon) in violation of Section 5(d) of the Pennsylvania Human Relations Act (Act) and ordered Circle to pay Dixon lost wages.[1] We affirm.

Dixon began working for Circle, a wholesale distributor of nuts and bolts, in June of 2000.[2] While initially working at Circle, Dixon was employed as a boxer/sorter, although she performed a variety of tasks at Circle's warehouse, including shipping, inventory, receiving and stocking. Dixon worked an average of forty hours a week for the eleven weeks she was employed by Circle.

Circle's warehouse was comprised of an upper warehouse area and a lower warehouse area. Dixon, the only female working in Circle's warehouse, used the ladies restroom in the upper warehouse despite there being a restroom in the lower warehouse that was available for use by male and female employees. For several years, sexually offensive graffiti covered the walls of the lower warehouse bathroom.

Dixon frequently observed Gene Walker (Walker), one of Dixon's fellow employees, picking on other Circle co-workers.[3] Dixon also observed Grant, the warehouse manager, "demeaning, criticizing, and em-

---

**1.** Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. § 955(d) provides:

**Unlawful Discriminatory Practices**

It shall be an unlawful discriminatory practice ...
    (d) For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge ... in any investigation, proceeding or hearing under this act.

**2.** Prior to being hired, Dixon was interviewed by Edward Grant (Grant), Circle's warehouse manager, at which time Grant informed Dixon that "the work environment is 'very dominant male', [sic] and 'if anybody said anything that [Dixon] felt was inappropriate that she should report it to [Grant].'" Commission's Findings of Fact (F.F.), No. 8.

**3.** Harold Gaskill (Gaskill), one of Walker's co-workers, testified that "Walker's harassment of others was constant and made it 'pure hell' working everyday." F.F. No. 22. Generally, however, Dixon was not directly subjected to Walker's taunting on a daily basis.

barrassing employees in front of everyone by doing things and calling employees 'stupid idiots,' saying to an employee 'you're dumber than a box of rocks,' or 'you don't know what you're doing.' "[4]  F.F. No. 26.

In mid-August of 2000, while working in Circle's warehouse, Dixon heard Walker singing song lyrics which Walker modified to make sexually explicit.[5]  Dixon asked Walker to stop singing the sexually offensive song but Walker merely laughed and continued singing.

Dixon notified Mark Gubbiotti (Gubbiotti), Circle's Operations Manager, of the incident within twenty-four hours of its occurrence.[6]  Gubbiotti responded that, in regard to this incident involving the sexually explicit song, he would get back to Dixon.  Later that same day, Gubbiotti offered Dixon a position in Circle's purchasing department, which Dixon accepted.

During her first three days in the purchasing department, Dixon worked half of the day in the warehouse and the remaining half of the day observing Corinne Pace (Pace), Circle's purchasing department supervisor, and Krista Coolbaugh (Coolbaugh), the Circle employee that Dixon was to replace.

During her second week in the purchasing department, Dixon continued her training with Pace and Coolbaugh, while she took notes, filed, entered lists of parts inventories on the computer and called vendors.  By Thursday of her second week, Dixon was performing her new job in the purchasing department without the help of Pace or Coolbaugh.  By Friday of her second week, however, Gubbiotti terminated Dixon due to her alleged inability to handle the job and for "snapping" at Pace.

The same day that Gubbiotti fired Dixon from Circle's purchasing department, he offered Dixon a position with Circle, working at Pride Mobility Products (Pride), one of Circle's customer's facilities.  No other Circle employee had ever been assigned this position.  The job at Pride entailed removing boxes of nuts, bolts and fasteners from a pallet and emptying the boxes into bins.  Dixon earned the same amount of pay while working in Pride's warehouse as she did at Circle's warehouse.  Dixon was subsequently fired from Pride one week after accepting the job at Pride's warehouse.[7]

Following her termination at the Pride facility, Dixon sought employment through newspapers, Career Link, word-of-mouth, as well as submitting applications to numerous places.

In October of 2000, Dixon obtained employment at U.S. Metal Forms (U.S. Metals).  Dixon subsequently quit her employ with U.S. Metals after two weeks, because she felt unqualified to inspect parts for airplanes.  Thereafter, Dixon again looked

---

4.  Dixon testified, however, that while she felt that Grant had demeaned other employees, she did not feel as though Grant had treated her poorly.  F.F. No. 27.

5.  The lyrics referred to young boys sucking on grown men's penises.  F.F. No. 29.

6.  Dixon testified that she informed Gubbiotti instead of Grant, Circle's Warehouse Manager, because "she felt Grant demeans employees and that Grant just laughed at Walker's behavior."  F.F. No. 34.

7.  Gubbiotti insists that he became aware that Dixon was planning to quit her job at Pride and thereafter extended Dixon an offer to return to Circle's warehouse, but Dixon declined.  On the other hand, Dixon contends that, although she indicated she would return to the warehouse if the offensive behavior stopped, she was told "she could not lift the weights necessary and that Circle had no job for her."  Commission's opinion, at 20.

in newspapers, and she applied to over twenty potential employers in an effort to find employment. Within six months of leaving U.S. Metals, Dixon obtained a job with Medex, until lack of work forced Medex out of business. Dixon continued to look for work following the loss of her job at Medex until June 1, 2002.[8]

On February 9, 2001, Dixon filed a formal complaint with the Commission, contending that, throughout her employment at Circle, between June 19, 2000 and September 1, 2000, Circle had violated the Act. Specifically, based on Section 5(a) of the Act, 43 P.S. § 955(a), Dixon alleged sex based discriminatory treatment due to a hostile work environment and also alleged, based on Section 5(d) of the Act, 43 P.S. § 955(d), that Circle terminated her for her complaint regarding the warehouse environment.

Circle was provided with a copy of Dixon's complaint on April 30, 2001 and timely answered the complaint. On or about December 6, 2005, the Commission notified Dixon that it believed probable cause existed as to Dixon's allegations. A conciliation conference was held on February 15, 2006, but was not successful. Thereafter, a public hearing was held on August 16, 2007, before a hearing examiner.

The hearing examiner concluded that Dixon had failed to establish sex based discrimination based on a hostile work environment claim. The hearing examiner, however, determined that Dixon had met her burden in demonstrating retaliation, because even though Circle provided legitimate non-discriminatory reasons for Dixon's termination, Dixon thereafter proved that Circle's reasons were a pretext for unlawful discrimination as a result of her expression of opposition to Circle.

By order issued January 29, 2008, the Commission approved and adopted the hearing examiner's findings of fact, conclusions of law, and opinion, and also issued specific orders with respect to Circle.[9] Circle now petitions our Court for review.[10]

■ On appeal, Circle first alleges that the Commission erred in its application of the law to the facts and also that the Commission's findings do not support its conclusion that Circle had retaliated against Dixon for her opposition to Circle's purported discriminatory practices.

■ The complainant in a retaliation case establishes a prima facie case by demonstrating:

(1) that the complainant engaged in a protected activity;

(2) that Employer was aware of the protected activity;

(3) that subsequent to participation of the protected activity complainant

8. By the end of May 2002, Dixon began to fully mitigate any damages resulting from her termination from Circle and therefore, seeks no damages from June 1, 2002 to the present. Accordingly, the time period for which back pay will be considered is limited to September 1, 2000 to May 31, 2002.

9. The Commission acknowledged that while there was agreement as to the basic events, there was much disparity on several important aspects of critical events and therefore, the Commission engaged in a thorough credibility determination prior to reaching its conclusion. In doing so, the Commission set forth significant factual detail with which it premised its decision.

10. This Court's review of a Commission decision is whether the adjudication is in accordance with the law, whether constitutional rights have been violated or whether the findings are supported by substantial evidence. *Robert Wholey Company, Inc. v. Pennsylvania Human Relations Commission*, 146 Pa. Cmwlth. 702, 606 A.2d 982, 983, *petition for allowance of appeal denied*, 532 Pa. 659, 615 A.2d 1314 (1992).

was subjected to an adverse action by Employer; and

(4) that there is a causal connection between participation of the protected activity and the adverse employment action.

*Wholey*, 606 A.2d at 983. "Once the complainant makes this initial case, the burden then shifts to the employer to articulate some legitimate, non-discriminatory motive for its action. If the employer does so, the complainant is then given the opportunity to demonstrate that the proffered reasons were pretextual." *Spanish Council of York, Incorporated v. Pennsylvania Human Relations Commission*, 879 A.2d 391, 397 (Pa.Cmwlth.2005).

Circle asserts that Dixon did not meet the first and second prongs of retaliation because Dixon did not notify any of her supervisors of the sexually explicit song lyrics nor were the supervisors aware of any such inappropriate conduct. Although Dixon testified that she notified Gubbiotti of the hostile warehouse conditions, Circle alleges that the Commission erred in crediting Dixon's testimony as opposed to its own.[11]

■ However, "[i]n discrimination matters, the Commission has been recognized as an expert whose judgment will not be lightly substituted." *Wholey*, 606 A.2d at 984. "Moreover, questions of credibility and the weight of the evidence are for the Commission to decide." *Albert Einstein Medical Center v. Pennsylvania Human Relations Commission*, 87 Pa.Cmwlth. 145, 486 A.2d 575, 576 (1986). Here, the Commission credited Dixon's testimony

that Walker, despite Dixon's request, repeatedly sang a song with sexually explicit lyrics. Within twenty-four hours, Dixon notified Gubbiotti of the incident involving Walker.[12] Based on Dixon's credited testimony, the Commission properly concluded that Dixon met the first two prongs of retaliation in that Dixon complained to management of the sexually inappropriate behavior.

Circle further contends that Dixon did not meet the fourth prong of retaliation because Dixon did not demonstrate a causal connection between her alleged complaint and her subsequent termination.

■ "When participation in a protected activity and the occurrence of an adverse employment action occur within close proximity in time, causation is inferred." *Wholey*, 606 A.2d at 984. In this case, there is no dispute that Circle transferred Dixon within twenty-four hours of her complaint and subsequently terminated Dixon within a few weeks. Therefore, because Dixon established a prima facie case of retaliation, the burden shifted back to Circle to provide legitimate, non-discriminatory reasons for its actions in transferring and terminating Dixon.

Here, Circle maintains that it had a legitimate basis for offering Dixon a position in the purchasing department within twenty-four hours of Dixon complaining of Walker's offensive song lyrics. Although Dixon was the only person considered for the purchasing position, Circle alleges that Dixon was a good fit, as she was planning on taking business courses at a local community college and was receptive to the

11. The Commission found that Dixon had notified Gubbiotti of Walker's sexually explicit song and also that Grant "knew Walker had offended Dixon and just told Walker that that kind of language was not acceptable in the presence of women." Commission's opinion, at 15.

12. "'Protected activity' includes informal protests of discrimination such as complaints to management." *Bailey v. Storlazzi*, 729 A.2d 1206, 1214, n. 9 (Pa.Super.1999).

move. Additionally, Circle alleges that it wished to fill the purchasing position with a warehouse employee due to the experience a warehouse employee has with Circle's parts numbering system, and thus, Dixon was a good match. Circle also provided that Dixon was later terminated from the purchasing department because she was unable to multitask and had "snapped" at Pace.

The Commission, on the other hand, found that Dixon demonstrated that Circle's articulated reasons were a pretext for its discrimination.[13] Specifically, the Commission concluded that Circle's witnesses were not credible in their testimony regarding the reason for Dixon's transfer to the purchasing department and her subsequent terminations. Moreover, the Commission noted that "[t]he record shows that Circle has a 90 day probationary period for new hires, however, Dixon's opportunity to become acclimated to the stressful purchasing job was less than two weeks." Commission's opinion, at 25. Additionally, although Gubbiotti testified that Dixon's termination from the purchasing department was based upon a disciplinary issue, other Circle supervisors contradicted this testimony, indicating that Dixon's termination was performance-related. Commission's opinion, at 25. More importantly, as the Commission properly noted, "[i]t is simply not believable that a manager would send a disrespectful employee who was just terminated to work at a place where that same employee would be interacting with customers." *Id.* at 18.

Regarding Dixon's subsequent termination at Pride's facility, Circle argued that Dixon was fired from her position at the Pride facility because she was allegedly unable to handle the work and had planned to quit her employ with Circle as a result. However, the Commission, again, as it was permitted to do so, credited Dixon's version of the factual events that transpired.[14] As a result, the Commission found that, "after only a short time at Pride, [Dixon] was simply called into Gubbiotti's office and told she could not lift the weights necessary and that Circle had no job for her." *Id.* at 19–20.

Based on the above, the Commission properly determined that "Dixon was twice terminated because she had opposed Walker's behavior." *Id.* at 27. We conclude that substantial evidence in the record exists to support the Commission's determination.

■ Circle next argues that the Commission's finding that Dixon adequately mitigated her damages, was not based on substantial evidence. We disagree.

■ "Plaintiffs have·a duty to mitigate damages." *Raya and Haig Hair Salon v. Pennsylvania Human Relations Commission,* 915 A.2d 728, 735 (Pa.Cmwlth.2007). "The burden of mitigation imposed on a complainant is not onerous and does not require success. . . . All that is required is

**13.** If the employer demonstrates legitimate, non-discriminatory motives for its actions, the burden shifts once again to the complainant, who is given an opportunity to demonstrate that the proffered reasons were pretextual. *Spanish Council,* 879 A.2d at 397.

**14.** Additionally, the Commission acknowledged that "when participation in a protected activity and the occurrence of an adverse employment action occur within close proximity in time, causation is inferred." *Wholey,* 606

A.2d at 984. In fact, this Court in *Wholey,* determined that an adverse employment action taken within three months of the complainant's filing of a complaint with the Commission is sufficient to infer causation. *Id.* As such, the Commission acknowledged "the inference created by the short proximity in time between Dixon's expression of opposition and her terminations." Commission's opinion, at 24.

an honest, good faith effort." *Raya*, 915 A.2d at 735. On the other hand, "[t]he burden of proving that a complainant failed to exercise reasonable diligence in seeking comparable or equivalent employment lies with the employer.... To meet this burden, the employer must demonstrate that substantially comparable work was available and the complainant failed to exercise reasonable due diligence in seeking alternative employment." *Id.*

 "The question of mitigation of damages is a matter which lies within the sound discretion of the Commission." *Consolidated Rail Corporation v. Pennsylvania Human Relations Commission*, 136 Pa.Cmwlth. 147, 582 A.2d 702, 708 (1990). As indicated by this Court, "[w]e fashioned this rule because we believed that the Commission's expertise in determining the appropriate remedy in discrimination cases was superior to our own." *Id.* at 708–09.

As support for its argument, Circle notes that Dixon held only two jobs following her termination at Circle, and that Dixon voluntarily quit the position she had obtained with U.S. Metals within two weeks. Additionally, Circle contends that, in the time between her two jobs, Dixon turned down a job offer because the pay rate was too low.

Upon review of the record, we conclude that the Commission properly determined that Dixon adequately mitigated her damages. Here, the Commission determined that Dixon searched various sources to find employment, including newspapers, ads, and word-of-mouth, and also applied for numerous jobs. While Dixon did indeed voluntarily leave U.S. Metals, the Commission determined that her reason for doing so was reasonable, as Dixon did

not feel qualified to inspect parts on military planes. Following her voluntary leave from U.S. Metals, the record shows that Dixon reasonably continued her efforts to find employment.[15] The Commission's finding that Dixon adequately mitigated her damages was supported by substantial evidence.

Accordingly, we affirm the decision of the Commission.

### ORDER

AND NOW, this 11th day of August, 2008, the Order of the Pennsylvania Human Relations Commission in the above-captioned matter is affirmed.

---

**15.** While Dixon testified that she declined a job offer because she could not afford to work there, as the job paid only minimum wage and she would have been unable to pay for child care, it was not unreasonable for Dixon to have done so. Reproduced Record, at 107a.