Judge RENÉE COHN JUBELIRER joins in this dissent.

**Jo Ann DONALDSON, Appellant**

v.

**BUTLER COUNTY.**

Commonwealth Court of Pennsylvania.

Argued April 14, 2015.
Decided June 23, 2015.

Edward A. Olds and Jaimie L. George, Pittsburgh, for appellant.

Michael K. English, Butler, for appellee.

BEFORE: BONNIE BRIGANCE LEADBETTER, Judge and ANNE E. COVEY, Judge, and JAMES GARDNER COLINS, Senior Judge.

OPINION BY Judge ANNE E. COVEY.

Jo Ann Donaldson (Donaldson) appeals from the Butler County Common Pleas Court's (trial court) June 24, 2014 order affirming the Butler County Alternative Dispute Resolution (ADR) Panel's (ADR Panel) Findings of Fact, Conclusions and Determination (Determination) upholding

Donaldson's discharge from her employment with the Butler County (County) Area Agency on Aging (Agency). The issues for this Court's review are: (1) whether there was just cause for the Agency's termination of Donaldson's employment, and (2) whether the trial court capriciously disregarded the parties' stipulation. Upon review, we reverse and remand.

## BACKGROUND

Donaldson commenced her employment with the Agency in 2000.[1] In October 2011, Claimant was promoted to supervisor of the Agency's Adult Protective Services Unit. Her duties included "supervis[ing] protective service specialists who are engaged in the investigation of reports of elder abuse and the provision of services for older adults in need of protective services" in accordance with the Older Adults Protective Services Act (Act)[2] and Chapter 15 of the Commonwealth Department of Aging's Regulations (Protective Services Regulations).[3] Reproduced Record (R.R.) at 613a.

On April 11, 2013, the Agency received a Report of Need (RON) for an older adult client (Client) made by a care professional who had visited and tested Client. See R.R. at 668a–683a. The RON noted that Client had been diagnosed with dementia, was very confused and had a limited ability to conduct activities of daily living, yet her son and caretaker Richard Korber (Korber) left her alone for up to 19 hours per

---

1. Donaldson was a civil service employee. However, effective December 12, 2012, the County's Commissioners opted out of the State Civil Service Commission's agreement extending the Civil Service Act (Act of August 5, 1941, P.L. 752, as amended, 71 P.S. §§ 741.1–741.1005) to County personnel, in lieu of a County-developed and administered merit-based employment system subject to ADR. See Reproduced Record (R.R.) at 129a–131a; see also R.R. at 132a–147a.

2. Act of July 1, 1988, P.L. 381, as amended, 35 P.S. §§ 10225.101–10225.5102. Section 103 of the Act defines "[p]rotective services[ ]" as "[t]hose activities, resources and supports provided to older adults under this act to detect, prevent, reduce or eliminate abuse, neglect, exploitation and abandonment." 35 P.S. § 10225.103.

3. 6 Pa.Code §§ 15.1–15.161.

day. *See* R.R. at 670a–671a. According to the RON, Client had been hospitalized in January 2013 for failing to thrive, specifically, dehydration and the beginning stages of kidney failure. *Id.* Client was thereafter released from the hospital with the recommendation that she have 24–hour supervision. Korber initially agreed to and hired a service to provide the recommended care, but he discontinued the service in February 2013.

The RON also stated that, on April 5, 2013, Client developed an eye infection that required emergency surgery. *Id.* She returned home with oxygen on April 9, 2013 under her daughter Denise Scott's (Scott) care. The RON further provided that, before Client's eye surgery, Client's care plan consisted of either Korber or his wife visiting in the mornings to give Client her medications and breakfast, and in-home service care from 2:00 p.m. to 6:00 p.m. each day; Client was without supervision throughout the night until Korber or his wife visited some time the next morning. *Id.* It also reflected that Client often spent Sundays with her son Dennis Korber and that Scott visited from Erie every 4 to 6 weeks to care for her. *Id.* According to the RON, although Korber, Scott and Dennis Korber had been Client's joint powers of attorney (POA), Korber became Client's sole POA in January 2013 without his siblings' knowledge. *Id.* The RON identified Korber as the alleged perpetrator and

sought Client's immediate referral to the Agency's Protective Services Unit. *See* R.R. at 672a–673a. The RON stated that Scott would care for Client until April 12, 2013. *See* R.R. at 672a.

On Friday, April 12, 2013, Agency Clinical Deputy Administrator Ricky Lake (Lake) instructed Donaldson to observe new Protective Service Investigator Steve Brown's (Brown) investigation of Client's circumstances.[4] As a result of the investigation, Donaldson believed Client was at risk of harm under Korber's care and instructed Brown to speak to Agency Protective Services Unit solicitor Ronald Thomas (Thomas) who thereafter initiated emergency guardianship proceedings for Client. The trial court appointed Cheryl Shuler (Shuler) as Client's emergency guardian. Shuler, not Donaldson, had Client removed from her home and placed into an assisted living facility. However, because Client became violent during the removal process, she was initially committed to a mental care facility.[5]

The County hand-delivered to Donaldson a Pre–Disciplinary Notice of Charges, Explanation of Evidence and Opportunity to Respond/Present Testimony (Notice) charging that "proper protocol of ensuring the safety/wellbeing of [Client] was not taken" and that the "[l]east restrictive/intrusive measure[s] were not utilized[,] therefore resulting in potential liability for the [A]gency."[6] R.R. at 589a. The No-

---

4. Although Brown was newly hired by the Agency, he previously held a similar position in Allegheny County for approximately seven years. R.R. at 267a–268a, 279a–280a.

5. The emergency guardianship was terminated on May 16, 2013, and Client was returned to her home under 24–hour supervision.

6. The Notice was not dated. *See* R.R. at 589a–590a. However, at the ADR Panel hearing, the Agency represented that the Notice was given to Donaldson on April 22, 2013. *See* R.R. at 230a. This Court notes

that three days prior, Korber threatened to go to the media if his mother was not returned home. R.R. at 698a.

Section 15.2 of the Protective Services Regulations defines *"[l]east restrictive alternative"* as "[t]he appropriate course of action on behalf of the older adult which least intrudes upon the personal autonomy, rights and liberties of the older adult in circumstances when an older adult lacks the capacity to decide on matters and take actions essential to maintaining physical and mental health." 6 Pa. Code § 15.2.

tice also informed Donaldson that her employment was being suspended until a *Loudermill* hearing[7] could be conducted. The hearing was conducted on April 26, 2013. *See* R.R. at 590a. Thereafter, by May 7, 2013 letter, the County notified Donaldson that her employment was terminated effective immediately, due to "significant and material procedural and client's rights violations in breach of the standards contained in the applicable sections of the [Pennsylvania C]ode and the [Agency's Policy and Procedure for Guardianship Cases (Agency's Guardianship Procedure) ]." R.R. at 588a.

■ Donaldson exercised her right under the County's ADR Program to have the ADR Panel review her discharge.[8] The ADR Panel conducted hearings on September 13, 2013 and October 9, 2013. The ADR Panel issued its Determination on February 20, 2014, holding that "the County has produced more than sufficient evidence in this proceeding to support [its] decision ... to terminate [Donaldson's] employment for cause." R.R. at 10a. Donaldson appealed to the trial court, which without taking any new evidence,

heard argument on May 29, 2014. By June 24, 2014 opinion, the trial court affirmed the ADR Panel's Determination. Donaldson appealed to this Court.[9]

Donaldson argues that she was improperly discharged under circumstances in which her actions were in conformity with the Act and its regulatory mandates, in that she acted to protect Client under circumstances in which Client's responsible caregiver was an alleged perpetrator of Client's neglect.

## LAW

Initially, we clarify that the County's ADR Program mandates that removal actions

> shall be reviewed in light of merit criteria.... [M]erit criteria shall mean whether the infraction(s) committed ... logically or rationally touch upon the employee's competency and/or ability to perform their job duties or whether the infraction(s) ... hampered or frustrated the execution of the employee's job duties.

7. In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Supreme Court held that since a public employee has a property interest in his employment, under the United States Constitution's Due Process Clause, he must be afforded at least notice and a hearing before that employment is terminated.

8. Rather than proceed through the County's Five–Step ADR process, Donaldson appealed directly to the ADR Panel under the Fifth Step. *See* R.R. at 133a, 135a, 137a.

9. In evaluating a local agency adjudication, where a complete record is made before the agency, a reviewing court shall hear the appeal on the record supplied, and shall affirm the local agency's adjudication unless it violates constitutional rights, is not in accordance with law, violates the statutory provisions governing practice and proce-

dure before local agencies, or contains necessary findings that are not supported by substantial evidence.
*In re Rainmaker Capital of Chestnuthill, LLC*, 23 A.3d 1117, 1122 (Pa.Cmwlth.2011). Herein, Donaldson erroneously refers to the trial court's errors. However, "[b]ecause a complete record was made before the [ADR Panel], it is that body and not the trial court which is the ultimate factfinder in these proceedings, and has the prerogative to determine the weight to be given to the evidence." *SSEN, Inc. v. Borough Council of Borough of Eddystone*, 810 A.2d 200, 207 (Pa.Cmwlth. 2002).
On March 27, 2015, the County Commissioners Association of Pennsylvania filed an amicus curiae brief supporting the County's position. On April 7, 2015, Donaldson filed a reply brief to the County's brief. On April 9, 2015, she filed a reply to the amicus curiae brief.

R.R. at 132a. Section 9.0(a) of the County's ADR hearing rules requires the County to prove by a preponderance of the evidence that Donaldson's action or inaction on April 12, 2013 warranted her removal. *See* R.R. at 144a.

The County contends that "[a]lthough [Donaldson] was in a position that required the use of judgment, [her] right to use her judgment was not unfettered. [Donaldson's] judgment in seeking an emergency guardianship was erroneous, in light of the protocols that she should have applied to this particular situation." County Br. at 13.

According to Donaldson's job description, as Protective Services Supervisor, she was required to "function in accordance with the [Act] and the Protective Services [R]egulations[,]" and "with established ... policies and procedures." R.R. at 614a–615a. Section 102 of the Act provides:

It is declared the policy of the Commonwealth of Pennsylvania that older adults who lack the capacity to protect themselves and are at imminent risk of abuse, neglect, exploitation or abandonment shall have access to and be provided with services necessary to protect their health, safety and welfare. It is not the purpose of this act to place restrictions upon the personal liberty of incapacitated older adults, but **this act should be liberally construed to assure the availability of protective services to all older adults in need of them.** Such services shall safeguard the rights of incapacitated older adults while protecting them from abuse, neglect, exploitation and abandonment. It is the intent of the General Assembly to provide for the detection and reduction, correction or elimination of abuse, neglect, exploitation and abandonment, and to establish a program of protective services for older adults in need of them.

35 P.S. § 10225.102 (emphasis added).

Section 303(a) of the Act requires that an agency "provide for an **investigation of each report** ... [which] shall be carried out under regulations issued by the [D]epartment. These regulations shall provide for the methods of conducting investigations under this section...." 35 P.S. § 10225.303(a) (emphasis added). *"Investigation"* is defined in the Protective Services Regulations as "[a] **systematic inquiry conducted by the agency to determine if allegations made in a [RON] can be substantiated, or if the older adult referred to in the [RON] is an older adult in need of protective services, or both.**" 6 Pa.Code § 15.2 (emphasis added). Section 15.42 of the Protective Services Regulations requires that "[t]he investigation of a report categorized as priority shall be initiated as soon as possible. The agency shall assure that reasonable attempts to initiate the investigation will be made within 24 hours after the report is received." 6 Pa.Code § 15.42(a)(2).

A report is substantiated "[w]hen an investigation confirms the details of a report ... or determines that the subject of the report is an older adult in need of protective services[.]" 6 Pa.Code § 15.44(a). "Older adult in need of protective services[ ]" is defined as "[a]n incapacitated older adult who is unable to perform or obtain services that are necessary to maintain physical or mental health, for whom there is no responsible caretaker and who is at imminent risk of danger to his person or property." 35 P.S. § 10225.103. *"Caretaker"* is defined by the Protective Services Regulations as "[a]n individual ... that has assumed the responsibility for the provision of care needed to maintain the physical or mental

health of an older adult." 6 Pa.Code § 15.2. A "[r]esponsible caretaker" is one who is able and willing to provide the basic care and protection necessary to maintain the physical or mental health of an older adult. A caretaker reported to have ... neglected ... an older adult is presumed, subject to an investigation under this chapter, to be unable or unwilling to provide the necessary care and protection.

*Id.*

Once a report is substantiated, the agency must determine the "immediate steps that are necessary to remove or reduce an imminent risk to person or property." 6 Pa.Code § 15.41(a). Under non-emergency conditions, Section 303(d) of the Act specifically mandates that an agency conduct a client assessment and develop a service plan which

> shall provide for the least restrictive alternative, encouraging client self-determination and continuity of care.... If an older adult found to be in need of protective services does not consent to a client assessment or the development of a service plan, the agency may apply to the case the provisions of [S]ection 307 [of the Act (relating to involuntary intervention by emergency court order) ].

35 P.S. § 10225.303(d); *see also* 6 Pa.Code § 15.44(b). Section 307(a) of the Act states: "Where there was clear and convincing evidence that if protective services are not provided, the person to be protected is at imminent risk of death or serious physical harm, the agency may petition the court for an emergency order to provide the necessary services."[10] 35 P.S. § 10225.307(a); *see also* 6 Pa.Code § 15.71(a). The Agency's Guardianship Procedure declares that at the point such a step is taken, it must be "the least restrictive measure," and then it is the Agency's "[b]est [p]ractice" to "[m]ake every attempt to contact relatives regarding [a client's] need for a guardian and ask if they wish to be the Guardian." R.R. at 616a–617a.

Emergency guardianships are governed by Chapter 55 of the Probate, Estates and Fiduciaries Code (Code).[11] Section 5511(a) of the Code authorizes the. court to appoint a guardian for incapacitated persons upon petition and a hearing. 20 Pa.C.S. § 5511(a). Section 5513 of the Code authorizes the court to grant emergency guardianships if there is clear and convincing evidence that "failure to make such appointment will result in irreparable harm to ... the alleged incapacitated person." 20 Pa.C.S. § 5513.[12]

**10.** The emergency petition shall contain, among other things,

> (3) The name and relationship of a guardian, caregiver or other responsible party residing with the older adult, when applicable.
> ....
> (7) The specific short-term, least restrictive, involuntary protective services which the agency is petitioning the court for an order to provide.
> (8) A description of how the proposed services would remedy the situation or condition which presents an imminent risk of death or serious physical harm.
> (9) A statement showing why the proposed services are not overbroad in extent or du-

ration and why less restrictive alternatives as to their extent or duration are not adequate.
> (10) A statement that other voluntary protective services have been offered, attempted or have failed to remedy the situation. 6 Pa.Code § 15.72(a).

**11.** 20 Pa.C.S. §§ 5501–5555.

**12.** An emergency guardianship obtained under Section 5513 of the Code is effective for up to 72 hours. 20 Pa.C.S. § 5513. An emergency order may extend the guardianship for up to 20 days thereafter. *Id.* A full hearing must be conducted for an emergency guardianship to continue after the emergency order expires. *Id.*

### ADR PANEL HEARING

At the commencement of the September 13, 2013 ADR Panel hearing, the parties stipulated that "as of Friday, that afternoon [April 12, 2013], . . . [Client] was in need of 24-hour supervision." R.R. at 223a, 265a. Thereafter, the Agency presented evidence, including testimony from Brown, Thomas, Lake and Agency Director Beth Herold (Herold) to support Donaldson's discharge.

Brown testified that he and Donaldson visited Client's home on April 12, 2013 to determine what needed to be done to protect her. He recalled that Client refused to answer any of his questions or sign an assistance refusal consent form. He stated that Scott expressed concerns for Client's safety, and showed him the siblings' POA and letters from doctors stating that Client required 24-hour supervision. He recalled describing to Scott options for Client's care, including in-home service care until a long-term solution could be reached or placement in a personal care facility/nursing home. Brown recounted that Donaldson recommended emergency guardianship without exploring a less restrictive alternative. Brown described that Scott was apprehensive about that option, but relented because she had to return home to Erie on Sunday, April 14, 2013, and **she believed that a third-party guardian was preferable to a family member.** He declared that Donaldson directed him to begin the emergency guardianship petition (Petition) process.

Brown stated that he contacted Thomas, who asked if Brown had contacted Korber to see if he would agree to Client's placement. Brown recalled telling Donaldson that Thomas wanted Korber contacted, but Donaldson "basically told me that it's apparent that [Korber] is not providing the appropriate care[,] so I was not to call [Korber] at that time." R.R. at 271a. He stated that he called Thomas back, informed him of Donaldson's position and provided Thomas with the Petition information. He recounted that when Brown and Donaldson returned to Client's home that afternoon to institute the guardianship, Client's behavior led to crisis intervention. Brown disclosed that he later discussed with Lake his qualms about whether the emergency guardianship was the least restrictive step in Client's case. **He admitted recording on his investigation form that the RON neglect allegations were true and that Client was in need of protective services,** but that since Scott was with Client until Sunday, April 14, 2013, Client was not in imminent risk of harm. See R.R. at 291a–292a, 304a; see also R.R. at 676a–683a. **He acknowledged that, on May 28, 2013, Lake recorded on the investigation report that Client "was at imminent risk of danger."** R.R. at 308a (emphasis added); see also R.R. at 726a.

Brown testified that he spoke with Korber sometime after the guardianship was effective and, during that conversation, Korber acknowledged that he was aware in January 2013 that Client required supervision 24 hours per day, seven days per week (24/7), but that he arranged for such care only through the end of February 2013. **Brown related that Korber admitted that he did not have 24/7 supervision in place for Client as of April 12, 2013,** but contended that he could have if he had been contacted. **Brown recalled that it was not until "a long time" later that Korber developed a written care plan that afforded Client the 24/7 supervision she needed.[13]** R.R. at 306a (emphasis added).

---

**13.** Client's care plan was not put in place until 30 days later, on May 13, 2013, after Korber's counsel assured the Agency that Client would receive continuous, 24/7 care. See R.R. at 349a, 800a–801a.

Thomas testified that, as the Agency's solicitor, he "will prepare [guardianship petitions] if a decision by the Agency is made to file." R.R. at 241a. His responsibilities include gathering the necessary information and signatures and presenting the petitions to the judge. *See* R.R. at 241a. He stated that on Friday morning, April 12, 2013, Brown called and informed him that a guardianship for Client may be necessary that day. He recalled receiving the necessary Petition filing information at approximately 2:00 p.m., including medical reports reflecting that Client was in need of care 24/7. Thomas discussed the investigation with Donaldson, and learned that although Scott had been caring for Client for a short time and was scheduled to leave that day, she agreed that she could postpone her departure until Sunday, at which point Client would be alone. After Thomas determined that Korber was Client's POA, he suggested that Donaldson call Korber. Thomas recalled Donaldson saying that she would not call Korber because he is the alleged perpetrator. **Thomas stated that he nevertheless processed the Petition because he agreed that an emergency existed, and he was concerned about getting the Petition processed so late on a Friday when Client was going to be without supervision beginning on Sunday. He understood that Scott and Dennis Korber joined the Petition, which was filed at approximately 3:30 p.m. Thomas acknowledged that under circumstances in which an investigation uncovers verifiable information that a client is being harmed by the caretaker, it may not be necessary to speak with the caretaker before commencing guardianship proceedings.**

Lake testified that he assigned Donaldson to observe Brown's April 12, 2013 investigation. He recounted that, at approximately 2:30 p.m. that day, Donaldson entered his office while he was meeting with Leslie Boyle (Boyle) and informed Lake that she needed to pursue a guardianship and described the circumstances for him. Lake recalled asking Donaldson if she contacted POA Korber, and her telling him that she did not because he was the alleged perpetrator and she did not trust him. He stated that, during this exchange, Brown called Lake looking for Donaldson to inform her that the guardianship had been approved. Lake reported that it was at this meeting when he first learned that the guardianship request had been processed. **Nevertheless, Lake acknowledged that he reviewed Brown's investigation and agreed that there was evidence of Client's neglect by Korber.**

**Lake admitted that while Korber should have been contacted, since the guardianship was already approved, Lake did not contact Korber or direct anyone else to do so.** He recounted that because he became concerned that Donaldson proceeded without looking at the least restrictive means of mitigating the risk to Client, he reviewed the case the following week, discussed it with Brown and then brought it to Herold's attention.

Herold testified that she reviewed Donaldson's actions and determined that her investigation was deficient and not in accordance with the Agency's Guardianship Procedure and Donaldson's training. *See* R.R. at 616a–654a. In particular, Herold pointed out that the Agency's Guardianship Procedure requires that "every attempt has been made to contact relatives regarding the consumer's need for the guardian and ask if they wish to be guardian" and "all attempts to reduce risk to the consumer are exhausted," but that was not done in Client's case. R.R. at 352a; *see also* R.R. at 616a. She also stated that Donaldson underwent basic protective services training,[14] which included materials

14. In accordance with the Act, agency employees are required to meet minimum train-

presented at the Institute on Protective Services held on March 27, 2012, that "for an emergency and involuntary intervention, intrusive action may only be used as an action of last resort when all other attempts for resolution ha[ve] failed," and that emergency guardianship is in order only if there is clear and convincing evidence that imminent risk of death or serious physical harm will occur in the absence of protective services. R.R. at 354a; *see also* R.R. at 620a. She further related the Agency's policy that "before any action is taken, protective service workers, following regulations and good casework practice, must always be concerned about their client's right to self-determination and the least restrictive alternative," and they are to utilize available resources including other specialists and service providers. R.R. at 355a; *see also* R.R. at 621a–622a.

Herold described that, as part of a self-audit,[15] she submitted Client's case to the Department for review. The Department concluded by May 1, 2013 report that no consideration was given to keeping Client at home as she desired, and it cited the following facts: She had 24–hour care at the time of the RON, she was not in imminent risk of danger such that emergency guardianship was warranted, minimal information was gathered in the investigation and there was no systematic inquiry made to substantiate Client's need for protective services. *See* R.R. at 359a–361a, 655a–657a.

Herold stated that her concern was not with Donaldson's determination of neglect, but her failure to exhaust attempts to reduce Client's risks, *i.e.*, contact Korber, and employ the least restrictive means to eliminate the neglect. R.R. at 363a, 426a. She explained that if Korber was contacted and was uncooperative and/or Client was unable to pay for it, the Agency could have provided funded, temporary 24–hour in-home care after Sunday until longer term care management could be achieved. She related that it is the Agency's preferred option for clients suffering from dementia not to remove them from familiar surroundings so their symptoms are not exacerbated, which is what occurred with Client. Herold declared that Korber eventually developed and implemented a plan for Client, but it was difficult getting Scott and Dennis Korber on the same page.

At the October 9, 2013 ADR Panel hearing, Agency Aging Care Manager Ann Gayle (Gayle) stated that she was Client's Agency care manager who coordinated Client's care at Korber's request after Client's January 2013 hospital discharge. At that time, Korber arranged for Client to have 24–hour care. She testified that she was aware that Korber reduced the 24–hour care to 4 hours, but recounted that on April 9, 2013, after Client's eye surgery, Korber told Gayle that in order to keep Client at home, he would be willing to again increase those hours.

Donaldson and Scott presented evidence on Donaldson's behalf. Scott testified that she had been staying with Client after her hospital discharge following her eye surgery, that she informed Korber that she had to return home on Friday, April 12, 2013, and that she inquired about his plan for Client's care thereafter. **She recalled that she was not comfortable with Korber's response that he would cross that bridge when he came to it.** Scott stated

---

ing standards for protective services and undergo annual training. 6 Pa.Code §§ 15.121(c)(1), 15.127.

**15.** Herold explained that since the Agency's Protective Services Unit was already under scrutiny, it had been working very closely with the Department when there were any concerns about its cases. *See* R.R. at 358a, 373a–374a.

that she did not recollect Donaldson or Brown telling her that the Agency could provide Client interim in-home supervision until a longer-term solution could be reached. Rather, she recalled that Donaldson proposed emergency guardianship for Client under the circumstances, and asked Scott if she would like to be appointed Client's guardian. Scott explained that she told Donaldson it would be better if an unbiased third party was appointed as Client's guardian. Scott admitted that since she offered to stay with Client until Sunday, April 14, 2013, Client was in no danger during that time.

Donaldson testified that she had been trained by the Agency that "the emergency guardianship was utilized when we needed to consider the safety of the [Client] while our investigation was ongoing." R.R. at 526a. She stated that when she became Protective Services Unit Supervisor, she attended a training program that included emergency guardianship. Donaldson related that as supervisor, she oversaw, but did not personally investigate, nine emergency guardianships. She expressed that there were no questions about any emergency guardianship obtained during her tenure until the April 12, 2013 matter. Donaldson described the difference between a standard guardianship and an emergency guardianship is that, in an emergency, "you don't have the same time frames in which to address all the issues, because of the fact that you want to intercede rapidly to ensure that safety while you are going to do the investigation." R.R. at 527a. Donaldson asserted that although Section 15.72 of the Protective Services Regulations requires the Agency to contact the responsible family member prior to seeking an emergency guardianship, it requires contact with only those persons "residing with the older adult." 6 Pa.Code § 15.72(a)(3).

Donaldson explained that on the morning of April 12, 2013, as Brown spoke to Client, Scott informed Donaldson that she was scheduled to leave at noon, but was concerned because Korber did not have anyone lined up to relieve her. Donaldson described that because Client would not cooperate with Brown, she attempted to talk to Client, but Client became agitated and informed Donaldson that she did not need assistance because neighbors could help her if necessary. Donaldson recalled asking Client if she was wearing her emergency response button, to which Client responded that she was; however, Donaldson saw that it was hanging from Client's bedpost. She also related that Client was unable to operate the button upon request or to describe an emergency that would warrant its use.

Donaldson described Scott's opinion that, despite what her mother thought, help from neighbors was not a viable option. She also recalled a discussion about Scott taking Client back to Erie with her, but Scott was concerned that would cause more tension between her and Korber. Donaldson also stated that Scott attempted to contact Dennis Korber for assistance, but he did not answer his phone. Donaldson asked if Scott could extend her stay, and Scott agreed to remain with Client until Sunday. Donaldson testified that the only 24/7 supervision she could have offered Client at the time would have been institutional care, since in-home services take 3 to 5 days to several weeks to put into place, and it is only the extremely rare occasion when in-home care can be rapidly established. Donaldson admitted she was not aware that Korber had informed Gayle that he was willing to increase Client's in-home care if needed. Accordingly, Donaldson concluded that Korber's POA change, together with Scott's representations about Korber's reluctance to follow the 24-hour supervision recommendations,

along with the two doctors' letters and RON references that Korber had been leaving Client unsupervised for long periods, led Donaldson to suggest an emergency guardianship that "would help us secure [Client's] safety while we did our investigation." R.R. at 536a.

Donaldson acknowledged that the Agency's Guardianship Procedure provided that every attempt should be made to contact relatives regarding a client's need for a guardian, and explained that it must be applied on a case-by-case basis. R.R. at 617a. She admitted that she did not contact Korber because her concern at that point was Client's safety "before the weekend approached" and until a thorough investigation could be completed. R.R. at 541a. She testified that she did not feel that a discussion with Korber would change her assessment, since it was clear to her that he knew Client required 24/7 supervision but regularly left her alone for significant periods of time and, even with him knowing that Scott was leaving, he still failed to have care in place. Donaldson maintained that since there is a presumption that a reportedly neglectful caretaker is "unable to or unwilling to provide necessary care and protection[,]" there was no regulatory requirement that anyone contact Korber. 6 Pa.Code § 15.2.

Donaldson reflected:

[W]e were up against the clock.... While we have access over the weekend to our attorney and to a judge that's on call, we don't have access to the physicians if we need them. We don't have access to the in-home service providers if we need them. In-home service providers on weekends only have an on-call person working so that there is no ability to really open a case over the weekend.

R.R. at 544a. She stated that because there were no less restrictive alternatives, she instructed Brown to proceed with guardianship. Donaldson admitted that she directed that action without contacting Client's physicians because she had their letters. She testified that she did not access Client's existing case management file because she was in the process of obtaining an emergency guardianship, rather than completing a full investigation, which is not necessary in order to obtain an emergency guardianship. *See* R.R. at 554a–555a.

Donaldson declared that she acted because, based upon her years of experience, Client "was at imminent risk come Sunday afternoon." R.R. at 564a. She avowed that, based on what was occurring, she exercised all avenues she had available to her at the time. Donaldson stated that she believed Client was at imminent risk of serious bodily injury, or she "would not have taken that action." R.R. at 559a. She contended that she did not violate any law, regulation, County or Agency policy in this case, but rather did "everything the same in this case that we have done in all the previous ones." R.R. at 545a. She reported that Lake was ultimately on the same page, telling her to "do what I felt I needed to do at that point." R.R. at 543a. Donaldson declared that her failure to protect Client before Sunday could have opened the County up to great liability. Finally, she clarified that it was the emergency guardian, **not Donaldson,** who ultimately made the choice to remove Client from her home.

## LEGAL ANALYSIS

Since an adjudication cannot be in accordance with law if it is not decided on the basis of law and facts properly adduced, we hold that review for capricious disregard of material, competent evidence is an appropriate component of appellate consideration in every case in which such question is properly brought before the court.

*Leon E. Wintermyer, Inc. v. Workers' Comp. Appeal Bd. (Marlowe)*, 571 Pa. 189, 812 A.2d 478, 487 (2002). "[T]his Court has found an abuse of discretion where a [fact finder] ignored 'substantial, *uncontradicted* evidence in the record, and the strong inferences drawn from it....' " *Philly Int'l Bar, Inc. v. Pa. Liquor Control Bd.*, 973 A.2d 1, 3 (Pa.Cmwlth.2008) (quoting *Pennsylvania Dep't of Transp. v. Mazzarini*, 919 A.2d 295, 302 (Pa.Cmwlth. 2007)).

> A fact finder capriciously disregards evidence 'when there is a willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching a result.' [*Agostino v. Twp. of Collier*, 968 A.2d 258,] 264 [ (Pa.Cmwlth.2009) ] (quoting *Arena v. Packaging [Sys. Corp.*, 510 Pa. 34], 507 A.2d 18, 20 ( [Pa.] 1986)).

*Spencer v. City of Reading Charter Bd.*, 97 A.3d 834, 842 (Pa.Cmwlth.2014).

▮ Upon the filing of the RON, Donaldson was required to expeditiously conduct an "[*i*]*nvestigation* " which required Donaldson to (1) "determine if [the RON's] allegations ... can be substantiated, or if [Client] is an older adult in need of protective services, or both," [16] 6 Pa.Code § 15.2, and, if so, (2) determine the "immediate steps that are necessary to remove or reduce [the] imminent risk[.]" 6 Pa.Code § 15.41(a). To establish that, on April 12, 2013, Client was an older adult in need of protective services, there must be evidence that Client (a) was an incapacitated older adult, (b) with no responsible caretaker, *and* (c) who was at imminent risk of danger. 35 P.S. § 10225.103.

### a. *Incapacitated Older Adult*

In this case, there is no dispute that Client has dementia and, based upon the parties' stipulation, that "[Client] was in need of 24–hour supervision." R.R. at 223a, 265a. Thus, on April 12, 2013, Client was "[a]n incapacitated older adult who [wa]s unable to perform or obtain services that are necessary to maintain physical or mental health[.]" 35 P.S. § 10225.103.

### b. *Responsible Caretaker*

▮ The record evidence established that Korber was Client's sole POA and, as such, was the "[*c*]*aretaker* " who "assumed the responsibility for the provision of care needed to maintain [Client's] physical or mental health" as of January 2013. 6 Pa. Code § 15.2. In order to be a "[*r*]*esponsible caretaker*," Korber had to be "able and willing to provide the basic care and protection necessary to maintain [Client's] physical or mental health." *Id.*

In January 2013, during a time when it was clear that Client suffered from dementia, Korber became Client's sole POA without his other siblings' knowledge. The RON reflected that while under Korber's care, Client became dehydrated to the point of early kidney failure and hospitalization in January 2013. Despite two doctors' opinions that Client's dementia, as opposed to any temporary health issue, was the reason she required 24–hour supervision, Korber reduced Client's in-home care to a mere 5 hours per day (4 hours in-home care and approximately 1 hour by Korber and/or his wife) in February 2013. Thereafter, Dennis Korber, not Korber or his wife who purportedly visited Client daily, discovered and reported Client's April 2013 eye infection, which was serious enough to warrant emergency surgery. Moreover, the care provider who visited Client and issued the RON designated Korber the alleged perpetrator and deemed Client's situation such a priority to

---

**16.** Because the parties do not dispute that the RON's allegations were substantiated, we will focus on whether Client was also an older adult in need of protective services.

warrant immediate referral to the County for investigation within 24 hours. R.R. at 672a–673a; 6 Pa.Code § 15.42(a)(2).

Based upon their experience and training, Brown and Donaldson independently evaluated Client and determined that she was incapable of safely caring for herself. Brown and Donaldson also concluded that their expedited preliminary investigation substantiated the RON's allegations that Korber did not properly care for Client. Although Thomas was informed that Donaldson had not contacted Korber as he instructed her to do, he nevertheless initiated the guardianship proceedings based upon the circumstances. Thomas acknowledged that when a client's caretaker is the cause of his/her harm, it may not be necessary to contact that caretaker before initiating guardianship. Following their after-the-fact reviews of the investigation, Herold and Lake likewise agreed that Korber had neglected Client. Thus, the County's entire staff, some with the benefit of hindsight, agreed with Donaldson's conclusion that Client had been neglected and that Korber was the cause of the neglect. As a neglectful caretaker, Korber "is presumed . . . to be unable or unwilling to provide [Client] necessary care and protection." 6 Pa.Code § 15.2. Therefore, Client did not have a responsible caretaker on April 12, 2013.

### c. *Imminent Risk*

■■■ The relevant law makes clear that imminent risk is the standard by which Client's circumstances were to be evaluated. The Act's purpose is to provide protective services to clients at "**imminent risk** of abuse, [or] neglect[,]" and the Act is to be "**liberally construed.**" 35 P.S. § 10225.102 (emphasis added). Neither the Act nor the Protective Services Regulations define "imminent risk." Section 1903(a) of the Statutory Construction Act of 1972 provides that when words in a statute are undefined, they must be accorded "their common and approved usage[.]" 1 Pa.C.S. § 1903(a). "Where a court needs to define an undefined term, it may consult definitions in statutes, regulations or the dictionary for guidance, although such definitions are not controlling." *Adams Outdoor Adver., LP v. Zoning Hearing Bd. of Smithfield Twp.*, 909 A.2d 469, 483 (Pa.Cmwlth.2006). *Merriam–Webster's Collegiate Dictionary* (11th ed. 2004) defines "**imminent**" as "to **project, threaten, . . . : ready to take place;** *esp:* hanging threateningly over one's head . . . ." *Id.* at 621 (emphasis added).[17] "**Risk**" is defined as the "**possibility of loss or injury:** PERIL[;] . . . someone or something that creates or suggests a hazard[.]" *Id.* at 1076 (emphasis added).[18]

The parties agree that Client was safe while Scott remained with Client, but faced risk, *i.e.*, the "possibility of loss or injury [or] PERIL," once Scott departed. *Merriam–Webster's Collegiate Dictionary* at 1076. Donaldson sought the least intrusive measure which was to have Scott care

---

**17.** "Immediate," on the other hand, is defined as "acting or being without the intervention of another object, cause, or agency[;] . . . occurring, acting or accomplished without loss or interval of time . . . ." *Merriam–Webster's Collegiate Dictionary* at 620.

**18.** We acknowledge that Section 5513 of the Code under which this Petition was filed requires clear and convincing evidence of "irreparable harm." 20 Pa.C.S. § 5513 (emphasis added). *Black's Law Dictionary* defines "irreparable injury" as "[a]n injury that cannot be adequately measured or compensated by money and is therefore often considered remediable by injunction." *Id.* at 856. Because "imminent" refers to timing, and "irreparable" is a matter of degree, these terms are not mutually exclusive and, therefore, use of the term "irreparable" in Section 5513 of the Code does not in any way modify the requirements under the Act or the Protective Services Regulations.

for Client. However, Scott replied that she would be returning to Erie on Sunday and could not care for Client past that time. Based on that information, the RON, the doctors' letters, the interviews with Client and Scott, Brown and Donaldson determined that Client could not care for herself and needed 24-hour supervision because Client had dementia, Korber had not properly cared for Client over the previous months, and Scott could not continue to care for Client. On the afternoon of Friday, April 12, 2013, there was no plan in place or person to care for Client come Sunday when Scott would return home. Therefore, on Friday, Client's "project[ed], threaten[ed], ...: ready to take place ..." "possibility of loss or injury [or] PERIL" was present. *Merriam-Webster's Collegiate Dictionary* at 621, 1076.

Despite evidence that on April 9, 2013 Korber may have assured Gayle that he would increase Client's in-home service care, there was no evidence at Donaldson's immediate disposal on April 12th that any necessary arrangements had been made for Client's care on April 12th and thereafter. In fact, the evidence reveals that no plan existed to provide for Client's health, safety and welfare upon Scott's departure. Given Korber's history of neglecting Client, reducing her in-home supervision hours despite medical advice to the contrary, and failing to have a plan in place before or even on the day of Scott's planned Friday departure, Korber's assurance was unreliable. Notably, Donaldson's concern was confirmed by Korber's later admission to Brown that Korber did not have 24/7 care arranged for Client at that time and, despite Korber's fervor to have the guardianship dissolved, it took him over 4 weeks to establish a care plan nec-

essary to return Client safely to her home.[19] *See* R.R. at 292a–293a, 306a, 349a. Even then, before the guardianship was lifted, Korber had to assure the Agency of the plan and contingencies for Client's continuous 24/7 care. *See* R.R. at 800a–801a.

Donaldson was not alone in her concern about protecting Client on Friday, April 12th. According to the record, on Friday morning following Brown and Donaldson's assessment, Brown notified Thomas "regarding the potential that a guardianship may be coming." R.R. at 245a. Thomas received the information and documentation to start the Petition at approximately 1:30 p.m. *See* R.R. at 245a. Thomas reflected:

I had a couple of concerns at that time simply because it was going on 2:00. Actually, I think the e-mail said it came in at 1:28. I'm not sure I saw it at 1:28. I think it was closer to 2:00 by the time I looked at it. **It was a Friday, and so I was worried about being able to get a judge and getting the Petition pushed through.** Because the information that I received was that [Client] was going to be without care beginning on Sunday, which would have left her with about 24 hours of no care.

....

I think the Petition was actually filed and time[-]stamped around 3:30 or 3:40 that day. Then ..., I **had to wait while copies were made** down at the Orphan's Court. Then I believe I **got them to [the Agency] for service.**

R.R. at 246a–247a (emphasis added). Thomas explained further: "I thought **it was an emergency situation[ ] because it was Friday afternoon.** She was going to be without care on Sunday. And I was directed to, obviously. I wouldn't have

---

19. The fact that it took over 4 weeks to institute Client's care plan also supports Donaldson's initial assessment that arranging 24-

hour in-home care for Client on Friday, April 12, 2013 commencing Sunday, April 14, 2013 was not possible.

[filed the Petition] willy-nilly." R.R. at 249a (emphasis added). When Thomas was asked whether he would have filed the Petition if he disagreed with Donaldson's assessment, he responded: **"I didn't have a disagreement ... based on the information that was received, that the 24/7 care was needed and [Client] was going to be without care[.] I didn't have disagreement at that point in time there was an emergency situation."** R.R. at 249a (emphasis added). The Petition reflected that the 24-hour care Client required "[wa]s no longer available." R.R. at 763a. Both Thomas and the court determined, in their professional judgment, that Donaldson's recommendation to have an emergency guardian appointed for Client was warranted under the circumstances. Moreover, Thomas applied for an extension of the guardianship for an additional 20 days which the court granted; thereby, further supporting Donaldson's initial decision. Since Thomas and the court twice reached the same conclusion that Donaldson did on April 12, 2013, the ADR Panel's conclusion that Donaldson's judgment was wrong is not supported by and is contrary to the record evidence.

Finally, the County has offered no protocol under which Donaldson was mandated to contact the alleged perpetrator/non-responsible caretaker to discuss his plans for Client's continued 24/7 care after Scott had to leave on Sunday. Even if she had, and Korber assured her that care was in place, based upon Client's neglect at Korber's hands and nothing being in place as of Friday Donaldson rightfully would have no confidence in his representations. Thus, we hold that Client was at imminent risk of harm on Friday, April 12, 2013, when Donaldson initiated guardianship proceedings for Client.

Because the record evidence established that Client was (1) an incapacitated older adult, (2) with no responsible caretaker, *and* (3) who was at imminent risk of danger, Donaldson properly determined that Client was an older adult in need of protective services on Friday, April 12, 2013. 35 P.S. § 10225.103.

Upon substantiating the RON's allegations and concluding that Client was an older adult in need of protective services, Donaldson next had to determine the "immediate steps that are necessary to remove or reduce [the] imminent risk." 6 Pa.Code § 15.41(a). Herold testified that the Agency's pre-guardianship protocol requires contact with relatives, the least restrictive means are to be used to secure a client's safety, and the preference is for dementia sufferers to remain at home. The undisputed record evidence clearly establishes that Donaldson did not breach this protocol. Brown and Donaldson's collective testimony reveals that Scott, Client's daughter, was offered numerous alternatives for Client's care, including Scott remaining with Client and Client returning to Erie with Scott. Scott agreed to stay until Sunday, and chose the emergency guardianship in which she and Dennis Korber, Client's son, joined. Thus, Donaldson properly determined that the emergency guardianship was necessary to remove or reduce the imminent risk.

■ Notwithstanding, the ADR Panel concluded that cause existed for Donaldson's discharge because:

1. [Donaldson's] refusal to speak with or meet with [Korber] who held the 'Power of Attorney' was a serious error in judgment. It [sic] failed to consider the possibility that a satisfactory agreement could have been reached, or that by not contacting him the resentment and anger of [Korber] at this slight might damage conditions between her Agency and the care of [Client].[20] [ ] Donaldson apparently 'jumped' to the

---

**20.** The possible resentment and anger of a neglectful caretaker is not the legal standard.

assumption that [Korber], was the 'alleged perpetrator'[21] and therefore he would be unwilling to agree to short-term or long-term increased care for his mother. An attempt to gain his agreement may have been successful or fruitless, however, it is this Panel's belief that is was her obligation to try.[22]

2. [Donaldson's] failure to review all of the pertinent information in the [Client's] case files, which she had access to, prior to her decision to recommend an emergency guardianship, was a damaging oversight. She would have observed that Case Manager, [ ] Gayle had been working with the family of [Client] for some time and had recent conversations with [Korber] who holds 'Power of Attorney' for [Client]. She had in fact received agreement from him that he would see to his mother's supervision needs once his sister left for home.[23] She could have used [ ] Gayle as an introduction to [Korber] and his family and solicit her help in obtaining [Korber's] cooperation.[24]

3. [Client], [sic] because of the daughter's willingness to stay with her from Friday, April 12, 2013 to Sunday, April 14, 2013, would not have placed [Client] in imminent danger.[25] This time with [Client] under her daughter's supervision, would have allowed [ ] Donaldson to talk with [Korber] with 'Power of Attorney' and if necessary arrange for in-home care for [Client] to provide 24 hour supervision. If [ ] Donaldson had attempted to procure such supervisory care and wasn't able, she could have utilized her Agency's supervision to assist her in this effort. It is not readily apparent in this hearing that such an attempt was tried.

R.R. at 8a–9a.

## CONCLUSION

It is clear on the face of the ADR Panel's Determination that the ADR Panel imposed upon Donaldson the obligation to communicate with Korber; thereby, deliberately disregarding Korber's long-standing history of neglecting Client which, in light of the purpose of the Act and the Protective Services Regulations, Donaldson was required to consider in making

---

21. The undisputed record evidence cited extensively above clearly established that the RON designated Korber as the alleged perpetrator, and Brown and Donaldson's investigation found the allegations in the RON to be substantiated. Thus, the statement that Donaldson "jumped" to the conclusion that Korber was the alleged perpetrator is not supported by the record evidence.

22. The ADR Panel's "belief" is not the legal standard. As discussed above, the County offered no evidence to support this alleged "obligation."

23. The parties stipulated that Client needed 24–hour supervision. The fact that Korber would **not** "see to [Client's] supervision needs **[until] his sister left** for home" was one of the contributing factors establishing imminent risk. R.R. at 9a (emphasis added). In addition, because Korber was a neglectful caretaker, any assurances made by him were unreliable. Both Brown and Lake signed the

substantiated RON that Korber is a neglectful caretaker. R.R. at 676a–683a. Further, Brown testified that he recorded on his investigation form that the RON neglect allegations were true. R.R. at 291a–292a. Lake also acknowledged that he reviewed Brown's investigation and agreed that there was evidence that Korber neglected Client. Moreover, the County's entire staff agreed that Korber caused Client's neglect.

24. Korber's cooperation is not the legal standard. Further, as discussed herein, Korber was determined to be the neglectful caretaker. In addition, it is undisputed that Donaldson was working with Client's daughter, and Client's daughter and son agreed to the guardianship proceeding.

25. The legal standard is imminent risk, not imminent danger.

her decision on April 12, 2013. In addition, the ADR Panel incorporated and relied upon incorrect legal standards in its conclusions. Further, in each conclusion the ADR Panel relied on Korber's purported cooperation as being the linchpin to Donaldson's discharge, when in fact the law imposed no duty for Donaldson to contact Korber, and the uncontroverted facts reveal that any such contact would have been futile. Moreover, Lake and Thomas never challenged Donaldson's decision not to speak with Korber even though they were both in a position to do so.

Inherent in the emergency guardianship process the General Assembly established are the designated layers of oversight which serve to prevent a single person's unilateral decision and fulfill the Act's declared policy not "to place restrictions upon the personal liberty of incapacitated older adults, but . . . to assure the availability of protective services to all older adults in need of them." 35 P.S. § 10225.102. The RON notified the Agency of a concern for Client's safety. The Agency then had to determine if the RON was substantiated and/or whether Client was an older adult in need of protective services and, if so, what immediate steps are necessary to remove or reduce an imminent risk. 6 Pa.Code § 15.41(a). Before the emergency guardianship could be effectuated, Section 307 of the Act required the Agency to present clear and convincing evidence to the court that Client would be at imminent risk if protective services were not provided. Thus,

Thomas as an attorney and officer of the court had a duty to evaluate the facts before presenting such evidence to the court. Then, before granting the Petition, the court had a duty to ensure that there was clear and convincing evidence "that if protective services are not provided, the person to be protected is at imminent risk of death or serious physical harm." 35 P.S. § 10225.307(a).

The ADR Panel's decision is not in accordance with the law as it is based on improperly adduced law and facts. *Leon E. Wintermyer, Inc.* The ADR Panel clearly disregarded "substantial, *uncontradicted* evidence in the record, and the strong inferences drawn from it" and imposed non-existent legal standards in reaching its conclusions and in doing so abused its discretion. *Philly Int'l Bar,* 973 A.2d at 3 (quoting *Mazzarini,* 919 A.2d at 302). A review of the record reveals that Donaldson did not violate the Act, Protective Services Regulations or Agency procedures in protecting Client and, thus, did not commit an infraction that "hampered or frustrated the execution of [her] job duties." R.R. at 132a; *see also* 35 P.S. §§ 10225.102, 303(d). Accordingly, the trial court erred by upholding the ADR Panel's Determination.

 Based on the foregoing, the trial court's order is reversed, and this matter is remanded to the trial court to remand to the ADR Panel with the direction to reinstate Donaldson and to calculate the compensation which she is due taking into consideration Donaldson's obligation to mitigate her damages.[26]

---

**26.** This Court has held:

A plaintiff has a duty to mitigate damages. *Circle Bolt & Nut Co. v. Pa. Human Relations Comm'n,* 954 A.2d 1265 (Pa.Cmwlth. 2008). The duty to mitigate damages, however, 'is not onerous and does not require success.' *Id.* at 1270. All that is required to mitigate damages is to make 'an honest, good-faith effort.' *Id.* at 1271.

The employer has the burden of proving that substantially comparable work was available and that the plaintiff failed to exercise reasonable due diligence in seeking alternative employment. The substantially comparable or equivalent work refers to employment which affords virtually identical opportunities for a promotion, compensation and responsibilities. Whether the

## ORDER

AND NOW, this 23rd day of June, 2015, the Butler County Common Pleas Court's (trial court) June 24, 2014 order is reversed, and this matter is remanded to the trial court to remand to the Alternate Dispute Resolution Panel for further proceedings consistent with the opinion.

Jurisdiction is relinquished.

plaintiff properly mitigated damages is a factual determination to be made by the fact-finder.

*Merrell v. Chartiers Valley Sch. Dist.*, 51 A.3d 286, 298 (Pa.Cmwlth.2012) (citations omitted).

In light of this Court's holding, and since the trial court is not the factfinder, we need not address Donaldson's argument that the trial court capriciously disregarded the parties' stipulation.